R. A. BRYAN and Ruby M. Bryan, C. B. McNairy and Rowena A. McNairy, W. H. Weaver and Edith H. Weaver, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8032.

United States Court of Appeals
Fourth Circuit.

Argued March 17, 1960.

Decided July 13, 1960.

stituted a tax imposed upon and paid by such consumer."

240

Stanley Worth, Washington, D. C., and Claude C. Pierce, Jr., Greensboro, N. C. (Edward S. Smith; Blair, Korner, Doyle & Worth, Washington, D. C., and McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on the brief), for petitioners.

Karl Schmeidler and Arthur I. Gould, Attys., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The taxpayers, R. A. Bryan, C. B. McNairy and W. H. Weaver, are North Carolinians engaged in construction businesses. With respect to their operations in 1951, 1952, and 1953, deficiencies of income tax were asserted. They seek review of adverse decisions of the Tax Court, presenting numerous questions.

I

Bryan and McNairy were partners with Florence L. Rogers, Joe W. Stout and Terry A. Lyon in a venture to construct a rental housing project. Bryan, McNairy and Stout were paid salaries, out of borrowed funds. Each partner receiving salary reported on his income tax return for 1952 only so much of his salary as was in excess of his proportionate part of the total salary disbursements in the partnership's fiscal year, 1952. The theory was that, since there were no partnership earnings, the payment of salaries out of the proceeds of the loan was in part a return to each of a portion of his capital, while each partner suffered an ordinary business loss to the extent his capital was diminished by reason of the payment of salaries to other partners.

The facts with respect to this issue are fully set forth in the findings and opinion of the Tax Court[1] and more briefly summarized in our opinion in Rogers v. Commissioner.[2] What we said in Rogers as to this issue is applicable here. For the reasons there stated the case, as to this issue, will be remanded to the Tax Court for further proceedings not inconsistent with our opinion in Rogers.

II

Bryan and McNairy also raise the second issue we considered in Rogers, the deductibility of North Carolina sales taxes separately billed to the partnership by its vendors. Here, the year 1953, as well as 1952, is involved. Additionally, the identical issue is raised with respect to the operations of another partnership, Onslow Building Company, in which Bryan and McNairy were partners.

For the reasons stated in Rogers v. Commissioner, decided this day, we affirm the holding of the Tax Court that these taxes must be capitalized as part of the cost of the capital assets with respect to which they were paid.

III

Two construction companies, T. A. Loving & Co., controlled by the taxpayers, Bryan, McNairy and others, and W. H. Weaver Construction Company, controlled by the taxpayers, Weaver, formed a joint venture for bidding upon certain Wherry Act[3] housing projects. Through two corporations, organized for the pur-

1. 32 T.C. 104.

2. 281 F.2d 233.

3. Title VIII, National Housing Act, 12 U.S.C.A. § 1748 et seq.

pose, they constructed four separate projects with FHA insured loans aggregating $16,687,000. In line with the estimates in the loan applications, class B common stock, having an aggregate par value of $834,356, was issued to Seward H. Mott, an architect. In addition to the stock, Mott received $8,000 in cash. Mott had agreed to do the work for a fraction of the estimated fees and promptly sold his stock having a face value of $834,356 for $44,605.62. The corporation then redeemed a portion of the Mott stock from its purchasers, the taxpayers.[4] The stock turned in for redemption at par by the taxpayers had an aggregate par value of $618,368. These receipts on redemption of the class B stock, the taxpayers reported as long term capital gain after deducting their payments to Mott, their claimed cost basis.

During the entire period the taxpayers[5] owned the controlling class A stock of the housing corporations.

The facts are only sketchily summarized here. They were found in detail by the Tax Court. Its findings are not questioned here, except it is contended that the aggregate amount of the insured loans did not exceed the aggregate amount of the costs of construction and incidental costs, or, at least, not by the amount found by the Tax Court.

Whether or not initial rental receipts may have been an immediate source of some of the funds used to redeem class B stock is immaterial, however, as we recently held in Spangler v. Commissioner, 4 Cir., 278 F.2d 665. Indeed, the situation here is quite indistinguishable from Spangler. For the reasons there stated, we affirm the holding of the Tax Court that these housing corporations were collapsible within the meaning of § 117(m) of the Internal Revenue Code

of 1939, 26 U.S.C.A. § 117(m), and that the taxpayers' receipts on the redemption of class B stock were taxable to them as ordinary income.

### IV

The taxpayer, Weaver, employed an interesting variant of the stock redemption plan by which such promoters seek to appropriate to themselves, free of taxes on ordinary income, FHA's overcommitments on multiple housing projects. The question is whether he became taxable upon his retention of the excess funds provided by FHA when he was relieved of any obligation to repay the insured loan.

Weaver, individually, purchased four tracts of land and constructed 217 houses on them. His total cost of land, land improvements and buildings was $1,485,-701.96.[6] Before construction began, however, he had obtained FHA mortgage insurance commitments on each of the houses he proposed to build. These commitments, running to four prospective corporations, as mortgagors, and to Weaver Realty Company, which Weaver controlled, as mortgagee, aggregated $1,692,350. He also obtained a commitment from Federal National Mortgage Association to purchase the FHA insured notes and deeds of trust.

With these commitments in hand, he obtained commitments from a bank for construction loans up to a maximum total of $1,692,350. He obtained advances from the bank, from time to time, totalling $1,643,500, which exceeded his cost, including the cost of the land, by $157,798.04.

While the houses were under construction, Weaver organized four corporations, each with paid-in capital of $500. When the construction work was done, he conveyed one of the four tracts of land to each of the four corporations in ex-

---

4. Less than all of the class B stock was redeemed because of restrictions imposed by FHA.

5. The word is used indiscriminately here as between husband and wife. Each of the three couples filed a joint return.

6. The construction work on three of the tracts was done by W. H. Weaver Construction Company, Inc. On the fourth tract, it was done by Weaver and one Thomas Wilson, who participated in that phase of the venture.

change for stock having a total par value of $500 and an assumption of the construction loan on the land and houses transferred. The corporations the.i borrowed $1,692,350 from the bank secured by their 217 notes and deeds of trust and Weaver's personal guarantee. Weaver's personal loans were paid out of the proceeds of these loans. The corporations issued similar notes and deeds of trust, aggregating $1,692,350 to Weaver Realty Company, which sold them to FNMA in accordance with its commitment. FNMA's checks, payable to Weaver Realty Company, were endorsed over to the bank, in discharge of the indebtedness of the four corporations to the bank.

On his tax return for 1953, Weaver appended a note that he had sold, for stock, land and buildings to the four corporations, which assumed outstanding mortgage indebtedness. He disclosed no figures, but asserted that no gain or loss on these transactions was recognizable, because of the provisions of § 112(b) (5) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 112(b) (5). That is his position here.

Concentrating upon the corporations' interim assumption of his indebtedness to the bank, the taxpayer glosses over the $157,798.04 he obtained in cash, and asserts that, by virtue of the provisions of § 112(k), the assumption of the indebtedness is not "other property" within the meaning of § 112. He takes comfort in the fact that in the 1939 Code there was no provision comparable to § 357 of the 1954 Code, 26 U.S.C.A. § 357. This leads him to conclude it was quite immaterial that the indebtedness assumed was in excess of his basis.

We need not so restrict our view of what actually occurred. The corporations not only assumed the indebtedness; they paid it, with the result that it freed the large amount of cash in the hands of the taxpayer. Though accomplished by indirection, it was, in effect, a payment of cash, in addition to the stock, for the properties transferred, for Weaver's personal indebtedness to the extent it exceeded his actual cost of the properties was an extraneous thing, having no business connection with the property. As a cash payment, the nonrecognition sections would have no application.

If we consider the matter under § 112(k), however, that section requires that we treat an assumption of liability as "other property," if, considering the nature of the liability and the circumstances surrounding the arrangement for its assumption, it appears that the taxpayer's purpose was to avoid federal income taxes, or was not a bona fide business purpose.

There was testimony that the taxpayer's attorney had advised him to assume no long term debts. That was offered as a business purpose for the transfer of the properties to the corporations, but no attempt is made to suggest any business purpose for his borrowing funds in excess of his cost, or his arranging to have the corporations assume that unrelated personal indebtedness. Clearly, his only purpose was to appropriate to himself a major portion of the excess funds which had been committed by FHA and FNMA, and to do it in a form which gave him hope of avoiding federal taxes on the funds with which he enriched himself. The transfer of the properties to corporations, subject to a debt not exceeding his cost, may well have had a business purpose, but it is his purpose in arranging for the assumption by the corporations of the excess indebtedness which is critical under § 112(k).

We think it plain that Weaver received "other property," and that § 112(b) (5) is inapplicable.

Since the Commissioner properly recognized the gain on the transaction, § 117(o) requires that so much of the gain as was attributable to his transfer of depreciable assets to his wholly owned corporations be taxed as ordinary income. Perhaps the taxpayer would be entitled to have his sale of the land treated as a sale of a capital asset, but as the Tax

Court found,[7] not unreasonably, the gain substantially exceeded the amount of the cash he received, upon which alone the Commissioner based the deficiency. The Tax Court found that the land and buildings had a value at least as much as the committed loans. If the land and buildings, in light of their prospects for producing income, had such a value, the stock Weaver received in the exchange would have had substantial value as found by the Tax Court. If that were taken into account, a reasonable allocation of his total gain would disclose a gain on the sale of depreciable assets in a greater amount than the $157,798.04 which the Commissioner added to his gross income. If the Commissioner's assessment was not incorrect, though on the wrong theory, the Tax Court properly supports it and we necessarily affirm.[8]

## V

■ Bryan complains of the disallowance of his deduction in 1951 of $16,-000 claimed to be a bad debt. He had endorsed notes for one Bagley, a beer distributor. At the request of the bank, of which he was a director, Bryan paid the notes and, in April and September 1951, took notes from Bagley aggregating $16,000.

Bryan testified that nothing had been paid on the notes, though payment had been demanded. He said he talked to Bagley and to officials at the bank and came to the conclusion that Bagley was insolvent when the notes were delivered. He produced none of the information that led to the conclusion. Bagley was in active business. The worth of the business Bryan did not know. He said Bagley owed $6,000 to another person and an unknown amount to a third creditor, but such proof hardly establishes the insolvency of a beer distributor.

We think the Tax Court was not required to accept the taxpayer's unsup-ported conclusion that the notes were worthless in 1951.

## VI

■ The Commissioner included in McNairy's 1951 income certain commissions accrued during that year. He did so on the theory that McNairy was on an accrual basis.

Admitting he used an accrual method for the deduction of state income tax payments, McNairy testified that he reported salaries and commissions in the year of their receipt and took other deductions in the year of payment. He showed unfamiliarity with the returns and their preparation. He did not know of items, other than state taxes, reported on the accrual method and "thought (he) was on a cash basis." McNairy's accountant was a witness, but did not say what basis was used by him in preparing McNairy's return.

On this record, we think there was such uncertainty that a finding that the Commissioner's determination was incorrect was not required.

## VII

■ The Bryans and the McNairys filed declarations of estimated tax shortly before, or shortly after, the close of each of the years 1951, 1952 and 1953, except the McNairys never filed one for 1952. The Tax Court sustained the imposition of penalties for late filing under § 294(d) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 294(d) (1) (A).

Bryan and McNairy relied upon an accountant to prepare their returns and declarations, and they seek to excuse their tardiness on the ground that he did not prepare the declarations earlier. They do not claim that he advised them that declarations were not required to be filed earlier, and the Tax Court found that these very prosperous business men

---

7. 32 T.C. 411.

8. Helvering v. Gowran, 302 U.S. 238, 245–247, 58 S.Ct. 154, 82 L.Ed. 224; Coastal Oil Storage Co. v. Commissioner, 4 Cir., 242 F.2d 396; Alexander Sprunt & Son v. Commissioner, 4 Cir., 64 F.2d 424.

with large tax liabilities must have been aware of the much publicized requirement of the filing of declarations by March 15 of the current year. The taxpayers made no effort to furnish the accountant with information for the preparation of a declaration until it was many months past due.

Reliance upon the mistaken advice of a professional man, believed to be expert, may be reasonable cause for delay in filing.[9] The neglect of the accountant, however, does not always establish the care of the taxpayer. He may be guilty of wilful neglect, too. At least here, we think it was a question of fact and that we are bound by the Tax Court's finding.[10]

## VIII

■ The penalty for underestimation was also assessed against Bryan for 1952. His tardy declaration for that year disclosed his estimate as $10,164.80, though, on his return filed later, he reported a much larger liability.

In Commissioner v. Acker,[11] it was decided that both penalties could not be assessed against a taxpayer who filed no declaration. Filing no declaration is not an affirmative estimate of no tax liability. It may be incongruous that one who tardily files an underestimate subjects himself to greater penalties than could have been imposed had he filed no declaration, but we find nothing in this situation to suggest that the Congress meant the two penalties to be mutually exclusive. The amount of the penalty under § 294(d) (2), which cannot exceed six per cent of the excess of the liability over the estimate, is reasonably related to delay in receipt of the money.

Since Bryan did file an estimate which fixes the basis of the penalty, we find nothing in Acker which would warrant us in relieving him of it.

Affirmed in part and remanded.

---

9. McIntyre v. Commissioner, 6 Cir., 272 F.2d 188; In re Fisk's Estate (Fisk v. Commissioner), 6 Cir., 203 F.2d 358; Haywood Lumber & Mining Co. v. Commissioner, 2 Cir., 178 F.2d 769; Mayflower Investment Company v. Commissioner, 5 Cir., 239 F.2d 624.

10. Coates v. Commissioner, 8 Cir., 234 F. 2d 459; Clark v. Commissioner, 3 Cir., 253 F.2d 745; Ferrando v. United States, 9 Cir., 245 F.2d 582; Southeastern Finance Co. v. Commissioner, 5 Cir., 153 F.2d 205.

11. 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127.