Lee Friend and Wanda S. Friend v. Commissioner.
Friend v. Commissioner
Docket No. 72769.
United States Tax Court
T.C. Memo 1961-167; 1961 Tax Ct. Memo LEXIS 184; 20 T.C.M. (CCH) 858; T.C.M. (RIA) 61167; June 8, 1961
*184 Held, that no part of an amount of $7,500 paid in the year in question by the petitioner to his creditor constituted a payment of interest entitling the petitioner to a deduction under section 163(a) of the Internal Revenue Code of 1954; that the full amount received by the petitioner in the year in question pursuant to an agreement following severance of his employment with a corporation, in which the petitioner released the corporation and its principal stockholder from all claims against them, constituted ordinary income to the petitioner, and that no part represented long-term capital gain from the sale of any interest in stock of the corporation; and that petitioners are liable for an addition to tax upder section 6651 of the Internal Revenue Code of 1954, they having failed to show that their failure timely to file their income tax return for the year 1954 was due to reasonable cause and not due to willful neglect. Mandel M. Einhorn, Esq., for the petitioners. William F. Chapman, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax and additions thereto for the taxable year 1954 as follows: I.R.C. 1939
I.R.C. 1954
Sec. 294
Sec.
Income Tax
Sec. 6651(a)
(d)(1)(A)
294(d)(2)
$8,494.03
$3,350.18
$1,340.07
$804.04
The respondent has conceded error in determining an addition to tax under section 294(d)(2) and the petitioners have conceded liability for an addition to tax under section 294(d)(1)(A). The issues for decision are (1) whether petitioners are entitled to deduct interest in the amount of $1,312.50; (2) whether the sum of $13,500 agreed to be paid to petitioner by the Apt Shoe Manufacturing Company at the time he terminated his employment is taxable as ordinary income in the year 1954, and (3) whether petitioners are liable for an addition to tax under section 6651(a). Findings of Fact The petitioners are husband and wife residing in New York City, New York. They filed a joint Federal income tax return for the taxable year *187 1954 on October 30, 1956, with the district director of internal revenue, Upper Manhattan, New York, New York. Lee Friend will hereinafter be referred to as the petitioner. Since 1945 the petitioner has been engaged in the advertising business and as of August 1951 owned 50 percent of the stock of Friend-Sloane Advertising, Inc., James W. McGlone, Jr., owned the remaining 50 percent of the stock. On August 23, 1951, petitioner borrowed $7,500 from McGlone, which he agreed to repay with interest at 6 percent in monthly installments of $400 commencing with the month of September 1951. He failed to make any repayment of the loan and on June 22, 1954, suit was commenced by McGlone in the Supreme Court of the State of New York, County of New York, by the service of a summons and complaint on petitioner in which demand was made for repayment of the loan of $7,500, plus interest. On July 23, 1954, a stipulation discontinuing the controversy without costs was entered into by McGlone and petitioner which recited and provided that the action was instituted to recover the sum of $7,500 with interest from August 23, 1951, which interest amounted to $1,312.50, or a total of $8,812.50; that *188 the parties each owned 50 percent of the outstanding stock of Friend-Sloane Advertising, Inc., which they had commenced to liquidate in August 1952, and that from time to time assets had been distributed in disproportionate amounts; that final adjustments, computations, and settlement had been deferred pending the disposition of certain tax claims; that simultaneously with the stipulation, petitioner had paid to McGlone $7,500; that the parties would now undertake to proceed with the complete and final liquidation of Friend-Sloane Advertising, Inc., and that upon final settlement of their respective accounts if a balance should be found to be due from McGlone to petitioner such balance would be credited to petitioner against the $1,312.50 due from petitioner to McGlone; and that if a balance should be found to be due from petitioner to McGlone, such balance would be debited to petitioner and "added to the One Thousand Three Hundred Twelve and 50/100 Dollars ($1,312.50)", and paid within 30 days without interest. By an instrument dated January 17, 1955, petitioner and McGlone entered into a further stipulation which recited and provided that the tax claims against Friend-Sloane Advertising, *189 Inc., had been adjusted and settled; that to equalize the corporate distributive shares of the parties, petitioner acknowledged his indebtedness to McGlone in the sum of $1,185.81, which, when added to the amount provided for in the stipulation of July 23, 1954 [namely, $1,312.50], resulted in an aggregate indebtedness of $2,498.31 of petitioner to McGlone; and that the stipulation of July 23, 1954, was thereby amended to provide that the sum of $2,498.31 should be paid by petitioner to McGlone in installments of $200 per month, the first of such installments becoming due on April 1, 1955, no provision being made for the payment of interest on such amount. In the joint return for the year 1954, the petitioner claimed as a deduction an amount of $1,312.50 as interest paid. The respondent disallowed the claimed deduction for lack of substantiation. The petitioner did not pay McGlone any amount as interest in 1954. In 1953 the petitioner was a partner in an advertising agency known as Friend-Reiss-McGlone. In that year E. Richard Apt, for whom the petitioner had previously done advertising work, approached the petitioner relative to becoming an executive in the Apt Shoe Manufacturing *190 Company, hereinafter referred to as the corporation, located in Boston. The corporation had 100 shares of stock outstanding. E. Richard Apt owned 50 shares, his brother owned 25 shares, and his son Donald owned 25 shares. The petitioner had several conferences with Apt, his attorney, and members of Apt's family who were connected with the corporation. In October 1953, the petitioner and his attorney, Samuel M. Sprafkin, and Apt and Alton Grauman, who was attorney for Apt and for the corporation, had a conference in Boston, at which an oral agreement was reached between petitioner on one hand and Apt and the corporation on the other. It was agreed that petitioner would leave his advertising agency in New York and take up employment with the corporation as of December 1, 1953; petitioner was to be vice president and sales manager and a member of the board of directors; petitioner was to receive from the corporation a basic salary of $25,000 per year; he was to acquire from Apt 20 shares of the corporation's stock for $60,000, [1] petitioner was to receive additional compensation each year in the amount of 20 percent of the excess of the corporation's yearly earnings over and above its *191 earnings shown on its financial report for the year ended November 30, 1953; such additional compensation, however, was not to be paid to petitioner, but was to be paid, after reduction by income taxes due from petitioner thereon, to Apt as payment on the purchase price of the 20 shares of stock; Apt was to hold the 20 shares of stock as security for the payment of the purchase price of $60,000; the employment was to be terminable at the will of either the petitioner or the corporation; if petitioer's employment should be terminated at any time during the 5-year period commencing December 1, 1953, and the book value of the stock at the time of termination was $60,000 or more, petitioner was to receive an amount equal to such book value, less, however, any amount remaining due Apt under the purchase agreement; if the petitioner had paid the full amount of $60,000, and the then book value was less than $60,000, he was to receive back from Apt the amount of $60,000 which he had paid; if the full amount of $60,000 had not been paid, and the book value was less than $60,000, the petitioner was to receive back from Apt the amount which he had paid on account. *192 At the time of this oral agreement Apt represented that the 20 shares of stock of the corporation had a value greatly in excess of the $60,000 purchase price, stating that the net worth of the corporation was between $450,000 and $500,000. The petitioner and Apt had intended to reduce the oral agreement to writing subsequently, but this was never done. In the early part of December 1953, the petitioner moved to Boston, leased an apartment there for a period of 2 years from December 1, 1953, and commenced his employment with the corporation pursuant to the agreement. In April 1954, the petitioner received for the first time a copy of the audit report of the corporation for the year ended November 30, 1953, which showed the net worth of the corporation as being about $250,000. Thereupon in late April the petitioner and Apt, with their respective attorneys, had a conference at which petitioner contended that there had been a misrepresentation of the value of the stock, that the amount which he had agreed to pay for the stock was in excess of its value, and took the position that if some adjustment could not be made his relationship with the company could not continue. In addition *193 to this the petitioner had found that he and Apt had difficulty working together. As a consequence, the petitioner's attorney and the attorney for Apt and the corporation carried on negotiations during the months of May, June, and July 1954, relative to an agreement to terminate the relationship between the petitioner and Apt and the corporation. It was first proposed that the corporation would pay petitioner a total sum of $12,500, payable $3,000 immediately and the remainder over a period ending April 1, 1955, such sum to cover the petitioner's expenses of $1,364.84 incurred in moving from New York to Boston and return, and that the corporation would assume the petitioner's obligations under the lease on his apartment in Boston. Later Apt and the corporation proposed, through their attorney, that the total payment be increased to $13,500, the initial payment be increased from $3,000 to $5,000, and that petitioner should pay the lessor of his apartment an amount of $1,600 for release of the obligation under the lease. On July 19, 1954, a written termination agreement was entered into between the petitioner and Apt individually and as president of the corporation. In the meantime *194 the petitioner had actually ceased his employment early in June 1954, and was paid his monthly salary through June 30, 1954. In such termination agreement it was recited that the corporation agreed to pay petitioner $13,500, of which $5,000 was to be paid immediately and the remainder was to be paid in monthly installments over a period ended May 1, 1955. Such agreement provided in part: WHEREAS Friend heretofore was employed by the Corporation and it was deemed to be in the interests of Friend and the Corporation that such employment be terminated; and WHEREAS Friend's employment by the Corporation has been and now is terminated; NOW, THEREFORE, for valuable consideration by each of the parties hereto to the other paid, the receipt whereof is hereby acknowledged, and in further consideration of the mutual agreements and releases hereinafter set forth * * *
V. Friend does hereby remise, release and forever discharge Apt and the Corporation from all claims, demands and liabilities of every name, nature and description whatsoever and, more particularly, and without limiting the generality of the foregoing, from all debts, actions, causes of action, suits, dues, sum and sums *195 of money, accounts, reckonings, bonds, specialities, covenants, contracts, controversies, agreements, promises, doings, omissions, variances, damages, extents and executions whatsoever both at law and in equity, or which may result from the existing state of things, which against Apt and the Corporation, or either of them, Friend now has or ever had, from the beginning of the world to the day of the date of these presents * * *. The agreement contained a similar release by Apt and the corporation of any and all claims against the petitioner. At or about the same time that the termination agreement was signed, the petitioner and the lessor of his apartment entered into an agreement providing for mutual releases in consideration of a payment by petitioner of $1,600. Payment of the $1,600 was effectuated as follows: petitioner's attorney received two checks from the corporation, one in the amount of $3,400 and one in the amount of $1,600, both payable to his order, and he endorsed the $1,600 check over in blank and gave it to the corporation's attorney who in turn transferred the check to the lessor of petitioner's apartment. In 1954, about the time of the termination agreement, *196 the petitioner borrowed from A. L. DeLara an amount which was approximately the same as the amount due to be paid to the petitioner by the corporation under the termination agreement. DeLara held such termination agreement as collateral security for repayment of the loan. Payments were made by the corporation, when due, to the petitioner's attorney who then turned the payments over to DeLara in repayment of the loan. Of the total amount to be paid by the corporation under the termination agreement, $9,000 had been paid by December 31, 1954, and $4,500 remained to be paid thereafter. No stock of the corporation was ever issued in the petitioner's name and no certificate of stock was ever given to him. At the date of the termination agreement, July 19, 1954, no amount of additional compensation had been calculated for the petitioner (based upon the excess of earnings over the prior year's earnings) and applied upon the $60,000 agreed purchase price of the 20 shares of stock in the corporation. In his income tax return for the year 1954, the petitioner reported only $9,000 as having been received in that year under the termination agreement. In his return he accounted for such $9,000 *197 as follows: Apt Shoe Mfg. Co.: 7/19/54 Settlement on Account of Stock
(Twenty Shares) and Payment for
Lease and Moving Expense
$9,000.00
Lease and Improvement Ex-
pense
$2,609.00
Moving Expense
1,364.84
3,973.84
NET RECEIVED FOR STOCK
$5,026.16
Legal Fee Paid
1,100.00
$3,926.16
12/1/53 Cost of 20 Shares of Apt Shoe
Mfg. Co. Stock
0
LONG TERM CAPITAL GAIN
$3,926.16
In the notice of deficiency the respondent determined that the petitioner received ordinary taxable income of $13,500 in the year in question pursuant to the termination agreement. Therein he stated: It has been determined that the total amount paid to you pursuant to a written agreement on termination of your employment with the Apt Shoe Mfg. Co. constitutes ordinary income, determined as follows: Long-term capital gain
per return
$3,926.16
Add: Lease and im-
provement expense
$2,609.00
Moving expense
1,364.84
Legal fee
1,100.00
Balance dis-
counted (unre-
ported)
4,500.00
9,573.84
Ordinary income
$13,500.00 The lease and improvement expense and moving expense claimed on the return as a reduction of the payments received *198 from Apt Shoe Mfg. Co. have been disallowed on the basis that these items do not constitute ordinary and necessary business expenses under the provisions of the Internal Revenue Code. The legal fees in the amount of $1,100.00 have been disallowed above and allowed to you as an ordinary deduction. The petitioners never prepared any of their own income tax returns. For many years prior to the taxable year 1954, their returns had been prepared by an accountant who was a member of an accounting firm and who had been a certified public accountant for more than 25 years. On April 6, 1955, at the petitioner's request, the accountant prepared a request, which was signed by petitioner, for an extension of time for filing petitioners' Federal income tax return for the taxable year 1954, stating that the information necessary for the preparation of the return was not available. Pursuant thereto an extension was granted by the district director of internal revenue to July 15, 1955. An additional request for an extension, signed by the petitioner, was made on July 11, 1955, based upon the same reason. Pursuant to such request the district director addressed a letter to the petitioner, which *199 was received by him, in which the time for filing was extended as follows: "Final Extension Granted To: 10-17-55." On August 24, 1955, the petitioner addressed a letter to his accountant requesting him to obtain a further extension of time for filing the 1954 return, stating: The reason I am writing is that by the time you receive this letter, I will be out of the country - I won't even have time to call you. I know it will be necessary to get an additional extension, and if there are any complications on this, I just won't know what to do because I won't be back before October. If you can get the extension, my assistant Miss LeBeau, will sign for me in my absence - for Wanda, also. Pursuant to such letter the petitioner's accountant prepared, or had prepared, a letter dated September 1, 1955, addressed to the director of internal revenue, requesting an additional extension of time for filing the petitioners' Federal income tax return for the year 1954 until November 15, 1955. Therein it was stated: Mr. Friend is out of the country at the present time and will be away for at least another month. He is still unable to file the return by the due date, September 15, 1955. *200 No such extension was granted. The joint income tax return of the petitioners for 1954, after being prepared by the accountant, was mailed to the district director on October 29, 1956, and was received by the director on October 30, 1956. On October 29, 1956, the petitioner addressed a letter to the director, stating in part as follows: We are enclosing our final returns for the years 1954 and 1955. We had previously requested extensions for filing these returns because of our inability to compile the necessary information within the required period. During the interim between the original due dates, the extensions granted by your office and the time of this filing, we have had extreme difficulties in finalizing the affairs of my former advertising business, had an unfortunate business venture in Massachusetts, my wife suffered the recurrence of an almost fatal illness, and our adopted baby son died. These events following one after the other have occasioned not only this delay, but have put me under great financial stress. In August 1955, the petitioners commenced negotiations to adopt a baby, filing applications in various places. They did adopt a baby about May 1, 1956. The *201 baby died on June 4 or 5, 1956. In the notice of deficiency the respondent determined that the petitioners are liable for an addition to tax under section 6651(a) of the Internal Revenue Code of 1954 in the amount of $3,350.18. Opinion The first issue is whether the payment of $7,500 made by petitioner to McGlone in 1954 included interest of $1,312.50 on the amount of the loan which McGlone had made to the petitioner. Section 163(a) of the Internal Revenue Code of 1954 provides for the deduction of interest paid or accrued within the taxable year on indebtedness. We may assume, since there is no evidence to the contrary, that the petitioner kept his accounts and filed his returns on the cash receipts and disbursements method of accounting. Accordingly the petitioner may deduct only interest actually paid by him in 1954. The petitioner contends that in the stipulation between McGlone and himself settling the controversy, the principal amount of the loan, $7,500, and the accrued interest of $1,312.50 were merged into one obligation of $8,812.50 and that the $7,500 payment would have to be considered as having been applied first to *202 payment of the interest due. He cites Shepard v. The City of New York, 216 N. Y. 251, 10 N.E. 435; Wooley v. Hoffman, 99 N.Y.S. 2d 293; and 6 Williston - Contracts, section 1801, pp. 5117-5118, for the proposition that in the absence of an agreement to the contrary, or some direction by the debtor, a payment will be applied first to interest when both interest and principal are past due. This doctrine is not applicable when from the circumstances it may reasonably be inferred that the parties did not intend that any of the payment should be applied to the payment of interest. See George S. Groves, 38 B.T.A. 727. We think such principle does not apply under the facts of this case. In the settlement stipulation of July 23, 1954, between petitioner and McGlone, it was recited that the petitioner owed $7,500 in principal and $1,312.50 as interest and that simultaneously with the execution of the stipulation the petitioner had paid McGlone $7,500. Such stipulation further provided that there would be a later settlement of their respective accounts arising from the liquidation of their corporation and that if a balance should be found to be due from *203 the petitioner to McGlone, such balance would be added to "the" $1,312.50, which was to be paid within thirty days without interest. In a revision of such stipulated settlement made in the year 1955, it was provided that this amount of $1,312.50, plus an additional amount owing by petitioner to McGlone should be paid in installments, and there was no provision made for the payment of interest thereon. We think that the reasonable conclusion to be drawn from these facts is that the parties considered that the payment of $7,500 in the year in question was payment of the principal amount due and that it was their intention that the interest of $1,312.50 was to be later paid. Accordingly, it is our conclusion that no part of the interest in the amount of $1,312.50 was paid in the year in question, and that the respondent did not err in disallowing the claimed interest deduction. The second issue relates to the taxability to petitioner of the payments made by Apt Shoe Manufacturing Company under the termination agreement of July 19, 1954. Such agreement called for the total payment of $13,500, of which $5,000 was to be paid immediately and the remainder was to be paid in monthly installments *204 over a period ending May 1, 1955. The amount actually paid by the corporation in 1954 was $9,000, leaving $4,500 remaining to be paid after the year in question. On brief the petitioner contends that the payment under the termination agreement was intended to represent, in part, a reimbursement of moving expenses from New York to Boston and return in the amount of $1,364.84 and an amount of $1,600 required to discharge the lease on petitioner's apartment in Boston, and that to this extent the payments do not constitute taxable income. He contends that the balance of the $13,500 constituted an amount paid to obtain relinquishment of a stock interest which the petitioner had in the corporation and a general release of all claims which the petitioner had against the corporation and Apt. Petitioner takes the position on the brief that such balance to be paid represented long-term capital gain upon the sale of 20 shares of stock of the corporation purchased on December 1, 1953, and sold on July 19, 1954. Petitioner makes no allocation of such remaining amount as between the claimed selling price of the stock and the amount paid for release of claims. The petitioner also contends that *205 if it be held that none of the amount constituted capital gain, he should not be charged with ordinary income in excess of the amount which he actually received in the year in question. Section 1221 of the Internal Revenue Code of 1954 defines a capital asset as "property held by the taxpayer", with certain exceptions. Section 1222 defines longterm capital gain as "gain from the sale or exchange of a capital asset held for more than six months". The question then is whether by the termination agreement of July 19, 1954, the petitioner sold an interest in stock of the corporation. This carries with it necessarily the question of whether he had acquired ownership of any such stock. Under the terms of his oral employment agreement with the corporation, the petitioner was to receive a fixed salary of $25,000 per year, and was entitled to additional compensation based upon a percentage of any increase of net earnings of the corporation over its net earnings for the fiscal year ended November 30, 1953. As a part of the agreement, and as an inducement to petitioner to accept employment, Apt, the principal stockholder of the corporation, agreed to sell to petitioner *206 20 shares of stock of the corporation for $60,000, which he represented to be less than its book value. This was to be paid for by payment directly by the corporation to Apt of any amount of additional compensation to which the petitioner might be entitled. The understanding was that each of the three stockholders of the corporation would furnish some of the stock to make up the 20 shares, that Apt would pay them for it, and would hold the 20 shares as security for payment of the $60,000. It was agreed that if petitioner's employment should be terminated at any time within five years, and at a time when the book value of the stock was less than $60,000 and petitioner had not fully paid $60,000, the petitioner was to receive back from Apt any amount which had been paid on account of purchase price. As of the time of the termination agreement no amount had been so paid on the agreed purchase price and no stock had been issued in the name of the petitioner. There is no evidence to show that any steps had been taken by Apt to acquire any stock from the other stockholders. There is no evidence to show that the book value of 20 shares of stock of the corporation was $60,000 or more. The *207 implication to be drawn from the record is that the book value was not as much as $60,000, since a balance sheet of the corporation as of November 30, 1953, indicated a book value of 20 shares as being about $50,000. We think it cannot be concluded that as a result of the oral agreement entered into at the time of first employment, the petitioner acquired any ownership in 20 shares of stock of the corporation. Rather, in our opinion, he acquired a right to acquire ownership if he remained in the employ of the company and payment was made as agreed. In addition, it may be pointed out that the termination agreement of July 19, 1954, makes no mention whatever of a sale of stock. It purports to be primarily an agreement terminating employment in which the parties mutually discharged each other from any claims. It may well be that among such claims of the petitioner which were discharged was a claim for some amount of additional compensation to be computed under the formula and applied on the agreed purchase price of the stock, but, even if so, any such payment would constitute ordinary income by way of compensation rather than selling price of an interest in stock. It is our conclusion *208 that no portion of the amount paid by the corporation under the termination agreement constituted a payment for a stock interest and that therefore no part of the payment constituted capital gain. Under the broad provisions of section 61(a) of the Internal Revenue Code of 1954, it is our conclusion that the full amount of $9,000 paid by the corporation under the termination agreement constituted ordinary income to the petitioner, whether it constituted additional compensation or was payment in settlement of any claims which the petitioner might have had against the corporation and Apt. As previously stated, the petitioner claims that some portion of the payment does not represent taxable income at all. On brief he claims that these amounts are $1,364.84, paid as reimbursement for moving expenses from New York to Boston and return, and $1,600 paid for discharge of the obligation under petitioner's lease on his apartment in Boston. [2] The petitioner does not advance any reason for nontaxability of the reimbursement of the moving expenses. In any event, there can be no question that such reimbursement constitutes taxable income. The expenses were personal expenses *209 of the petitioner and not expenses incurred in connection with the trade or business of his employer. See United States v. Woodall (C.A. 10), 255 F. 2d 370, certiorari denied 358 U.S. 824. Cf. John E. Cavanagh, 36 T.C. - (May 18, 1961). With respect to the $1,600 which was paid to discharge the obligation under the lease, the petitioner contends that the corporation had previously assumed such obligation and that consequently the payment was a discharge of its liability rather than his, and that no income should be attributed to him on account thereof. We think that the form which the discharge took is not decisive. The fact remains that the obligation was originally the personal obligation of the petitioner and that it was discharged through a payment made by the corporation. Such reimbursement constituted ordinary taxable income to the petitioner. *210 It follows, of course, from the specific terms of section 262 of the Internal Revenue Code of 1954 that none of the above personal expenditures of the petitioner constitute deductible expenditures. We note that in the notice of deficiency the respondent treated the full $13,500 required to be paid under the termination agreement as ordinary income to the petitioner in 1954, referring to the $4,500 which was paid after the close of the taxable year as "discount". This may imply that the respondent's theory was that the petitioner sold to DeLara his claim under the termination agreement and thereby realized the full amount of $13,500 in the year in question, but this is not discussed by the respondent on brief. In any event, we are satisfied from the evidence, including the testimony of the petitioner and his attorney, that the petitioner did not sell his claim to DeLara, but, rather, borrowed money from DeLara and merely deposited the termination agreement with DeLara as security for the repayment of the loan. Accordingly, we hold that the respondent erred in determining that the petitioner received in 1954 any amount of income from the termination agreement *211 in excess of $9,000. The petitioners obtained two extensions of time for filing their Federal income tax return for the taxable year 1954. The last date for filing, pursuant to such extensions, was October 17, 1955. Prior to the expiration of the date for filing as extended, the petitioner, who was then planning to take a trip outside the country, requested his accountant to obtain a further extension. The accountant did prepare a request for an extension until November 15, 1955. Whether this was actually mailed is not entirely clear from the record, but, in any event, no such extension was granted. The return was not filed until over a year later, on October 30, 1956. The respondent determined that the petitioners are liable for an addition to tax, pursuant to section 6651 of the Internal Revenue Code of 1954, [3] for failure to timely file their return. *212 The petitioners contend that their failure to file their 1954 return on or before the due date was due to reasonable cause and was not due to willful neglect. The issue is one of fact and the burden of proof is upon the petitioners. Arcade Realty Co., 35 T.C. 256 (Nov. 10, 1960). On brief it is argued on behalf of the petitioners there was no callous disregard of the obligation to file, that requests for extensions of time for filing were made, and that they relied upon their accountant and assumed in good faith that a further request for an extension of time had been made by the accountant and had been granted. It is also argued that the failure to file timely was due to reasonable cause in that it was occasioned by the petitioner's attempts, commencing in August 1955, to adopt a baby, the death of the adopted baby in June 1956, the recurrence of an almost fatal illness of the petitioner Wanda Friend, and the unfortunate business venture in Boston. There is no evidence whatever as to the nature or time of the illness of petitioner Wanda Friend; their adopted child died in early June 1956, which was long after October 17, 1955, the date for filing as extended; the *213 unfortunate business venture in Boston had been concluded in July 1955, which was long prior to the filing date; and there is no showing as to how the efforts to adopt the child could have been responsible for the failure to file. Furthermore, we seriously doubt that in failing to file their return by October 17, 1955, the petitioners relied upon any probability that their accountant would be able to obtain a further extension of time. They gave him no reason for such an extension except that they were going out of the country, and he in turn in his letter of September 1, 1955, merely stated that the petitioner was out of the country and would be unable to file the return on the due date. The petitioner was aware of the fact that the two prior extensions had been for relatively short periods, and in the last extension the district director had stated that the final extension dated was October 17, 1955. In addition, it may be added that if their failure to file had been induced by any expectation or belief that their accountant would be able to obtain a further extension, we think it obvious that upon returning to the United States, apparently sometime in October 1955, they would have *214 discovered that no such extension had been granted and would thereupon have filed the return instead of delaying for a full year before filing. But, in any event, we think it clear that any failure timely to file based upon the mere hope or possibility that the accountant might be able to obtain an extension would not be reasonable grounds for failure to file on or before the due date. The petitioner testified that he always relied upon his accountant in matters with respect to filing returns and obtaining extensions for filing. If this testimony were construed to mean that the petitioner expected his accountant to file a return timely in the event an extension could not be obtained, the petitioner still could not prevail on this issue. We have heretofore held that a taxpayer may not shift his responsibility to his accountant and claim that his failure timely to file his return was due to reasonable cause merely because the accountant did not prepare and file the return on time. R. A. Bryan, 32 T.C. 104, affd. (C.A. 4) 281 F. 2d 238, certiorari denied 364 U.S. 931. On this record we must conclude that the petitioners have failed to show that *215 their failure to file their return for the year 1954 on or before the due date, as extended, was due to reasonable cause and was not due to willful neglect. They have accordingly failed to show error in the respondent's determination that they are liable for an addition to tax under section 6651 of the Internal Revenue Code of 1954. Decision will be entered under Rule 50. Footnotes
1. The plan was for Apt and his brother and son to each furnish some of the 20 shares of stock to be sold to the petitioner. Apt was to pay his brother and son for the stock which they furnished. The record does not show whether the brother and son ever transferred any shares to Apt or whether he ever made any payment to them.↩
2. In his return the petitioner stated that the $9,000 payment made by the corporation in 1954 covered reimbursement of moving expenses in the amount of $1,364.84 and reimbursement of lease and improvement expense of $2,609. Also, in his petition he reiterated that there was a reimbursement of expenditures for lease improvement. At the hearing, and on brief, no mention was made of any amount for lease improvement. We think that under the circumstances it may be assumed that there was an amount of $1,009 paid as reimbursement to the petitioner for expenditures made in improvement of his leased apartment and such reimbursement would be governed by the principles relating to reimbursement of any other personal expense, such as the moving expense.↩
3. Section 6651 of the Internal Revenue Code of 1954 provides that: In case of failure to file any return * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.↩