WILLIAM C. HINES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hines v. Commissioner
Docket No. 1504-78.
United States Tax Court
T.C. Memo 1982-589; 1982 Tax Ct. Memo LEXIS 156; 44 T.C.M. (CCH) 1345; T.C.M. (RIA) 82589; October 6, 1982. Janice P. Noland, for the petitioner. Roberta P. Cona, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $150,059.12 in *157 petitioner's 1971 Federal income tax and additions to tax under sections 6651(a)[1] and 6653(a) of $36,710.58 and $7,502.95, respectively. After concessions, the remaining issues are (1) whether petitioner is entitled to bad debt deductions on the basis of certain transactions, and (2) whether petitioner is liable for additions to tax for failure to file his 1971 Federal income tax return and for negligence. FINDINGS OF FACT Some of the facts are stipulated and found accordingly. Petitioner, William C. Hines, resided in Gravois Mills, Mo., when he filed his petition herein. In early 1970, petitioner was a major stockholder in five Missouri banks and two Florida banks. [2] As a commercial banker, he was actively engaged in the management of these banks. Four of the Missouri banks were under examination by the Federal Deposit Insurance Corporation (herein "F.D.I.C.") for unsound banking practices, including irregularities with respect to "insider" loans. [3] The Missouri Commissioner of Finance criticized all five of the Missouri banks on similar *158 grounds. On October 16, 1970, petitioner and certain other stockholders of the Missouri banks (herein collectively referred to as the sellers), under pressure from the F.D.I.C. and the Missouri Commissioner of Finance, sold their stock in the five Missouri banks to five related corporations (herein the buyers) for cash and notes. [4] The buyers were granted the right to reduce the principal balances of the notes given if the sellers failed either to collect on behalf of the banks or to purchase at face value certain accounts receivable and notes due the banks. The notes were secured by liens on stock of the Missouri banks. By letters dated September 16, 1971, the buyers notified petitioner that they had exercised their rights to set-off completely the principal balances of the notes due to the failure by the sellers to cure several delinquent accounts. *159 Among the notes to which petitioner's obligation attached were separate notes executed by John F. Bell (herein the Bell note), John M. Dickey (herein the Dickey note), and George E. Owens (herein the Owens note) in favor of The Hopkins State Bank.See n. 2, supra. The Bell note was executed on September 16, 1969, in the face amount of $100,000. [5] The Hopkins State Bank endorsed that note to petitioner on December 2, 1970, without recourse. The principal balance was then $31,641.43. The Dickey note was executed on October 23, 1969, in the face amount of $100,000, and the Owens note was executed on October 8, 1969, in the face amount of $165,000. On December 30, 1971, petitioner acquired "participation certificates" in the Dickey and the Owens notes. Prior to the events leading up to petitioner's sale of his *160 stock in the Missouri banks, bank examiners of the State of Missouri ordered the removal of certain notes of L.A. Seaton and his wife (herein the Seaton notes) from the Missouri banks. The total amount outstanding on the Seaton notes was $274,764.43. On November 5, 1969, in exchange for petitioner's promise to pay off the Seaton notes, [6] the Seatons gave petitioner a security interest in approximately 1,036 acres of real property. [7] Rather than paying off the Seaton notes, petitioner caused the Missouri banks to assign the Seaton notes to the Citizens National Bank of Chillicothe (herein the Chillicothe bank) in return for the Chillicothe bank's payment of $274,764.43 to the Missouri banks. *161 Without any apparent connection to the Missouri banks, petitioner and Edward Appleton, a business associate, borrowed $70,500 in 1969. The loan was evidenced by a promissory note on which petitioner and Appleton were jointly and severally liable. Additionally, petitioner advanced money to Appleton on different occasions. On March 26, 1974, petitioner brought suit against Appleton and his wife seeking payment on a series of "loans" he allegedly made to them between 1965 and 1973. The two Florida banks in which petitioner owned stock, see n. 2, supra, were also under examination by banking authorities. [8] Consequently, in early 1971, petitioner and stockholders A. J. Curtas and Rodney N. Walters (herein Curtas and Walters), sold their stock in the Florida banks. Petitioner had granted John Dickey a power of attorney to carry out the sale. Dickey deposited petitioner's proceeds from the sale in a trust account with the Pan American Bank of Miami. Checks made payable to Curtas and Walters were drawn on the trust account by Dickey. In 1971, *162 petitioner advanced money to OHA Farms, Inc. (herein OHA Farms). [9] Among the stockholders of OHA Farms was petitioner's wife. On December 31, 1971, OHA Farms transferred its principal assets to petitioner's wife by warranty deeds covering approximately 1,450 acres of farmland. In 1972, such farmland was transferred to a corporation owned solely by petitioner and his wife. Petitioner did not file a 1971 Federal income tax return. The subsequent audit of petitioner for the taxable year 1971 was initiated as a result of an anonymous tip. In his notice of deficiency, respondent determined petitioner's income and asserted sections 6651(a) and 6653(a) additions to tax for 1971. Petitioner does not object to respondent's adjustments to income; however, petitioner claims he is entitled to certain bad debt deductions arising from the aforementioned transactions totalling $1,220,210.31 which completely nullifies the tax liability asserted by respondent. OPINION Section 166 generally governs the treatment *163 of bad debts. [10] In order to be entitled to a deduction under section 166, a taxpayer must establish (1) the existence of a bona fide debt owed to taxpayer, (2) basis in such debt, and (3) that such debt became worthless in whole or in part in the year the deduction is claimed. [11]Sec. 1.166-1, Income Tax Regs. The taxpayer bears the burden of proof with respect to these elements. Rule 142(a). [12]
Buyers' Notes
Petitioner claims a bad debt deduction "in excess of $500,000" in connection with his sale of stock in the Missouri banks. This claim is based upon the buyers' refusal to make payments to petitioner on *164 the buyers' notes. The buyers' notes were subject to set-off if certain notes and accounts receivable were not removed from the Missouri banks by the sellers. The buyers subsequently refused to pay on the notes based on their alleged rights under these set-off provisions. The record does not indicate that the buyers' action in setting off the notes was anything but proper. As petitioner's claim is based on the buyers' notes, he bears the burden of showing that no such right to set-off existed. Litigation concerning this issue continued in Missouri courts after 1971. under section 166, only a bona fide debt qualifies for a bad debt deduction. A "bona fide debt" is defined as a debt which arises from a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money. [Sec. 1.166-1(c), Income Tax Regs.] We find petitioner has not met his burden of proof that the buyers' notes were not properly set-off. Accordingly, we are unable to find the existence of valid debt which supports petitioner's claim of a bad *165 debt deduction in connection with the buyers' notes. Even assuming the buyers' notes constituted valid debt for purposes of section 166, petitioner would not be entitled to a deduction. The year a debt becomes worthless in whole or in part is a question of fact. Boehm v. Commissioner,326 U.S. 287, 294 (1945). In particular, we must consider the value of any collateral securing the debt and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs. The record herein contains no evidence concerning the buyers' financial condition. Denial of liability by the buyers is not proof of worthlessness since it does not indicate an inability to pay. Furthermore, the buyers' notes were secured by liens on stock of the Missouri banks. Petitioner has not submitted evidence concerning the value of such collateral in 1971. Accordingly, we find petitioner has not established the worthlessness of the buyers' notes in 1971. Bell, Dickey and Owens Notes
Petitioner claims a bad debt deduction of $38,141.43 on the basis of the Bell note, *166 and a deduction of $125,000 on the basis of the Dickey and Owens notes. [13]
Petitioner presents no evidence regarding the financial condition of Bell, Dickey, or Owens. Several cases have denied a bad debt deduction because there was no showing of the debtor's inability to pay the debt. Pierson v. Commissioner,27 T.C. 330, 338-339 (1956), affd. 253 F.2d 928 (3d Cir. 1958); Trinco Industries, Inc. v. Commissioner,22 T.C. 959, 965 (1954). [14] Furthermore, petitioner made no serious attempt to collect on these notes, nor does he indicate that any such efforts would have proven futile. A taxpayer must exhaust all reasonable means of collecting a debt before we can make a determination of worthlessness. A. Finkenberg's Sons, Inc. v. Commissioner,17 T.C. 973 (1951); Spratt v. Commissioner,43 B.T.A. 503 (1941). [15] In order for us to ascertain whether a debt is worthless, the record must contain facts *167 upon which we can make an independent judgment. [16]Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. 310 F.2d 815 (3d Cir. 1962); Schuman v. Commissioner,20 B.T.A. 1167, 1169 (1930). Petitioner's unsupported conclusion that these notes were worthless in 1971 is insufficient proof. [17]Bryan v. Commissioner,32 T.C. 104 (1959), affd. 281 F.2d 238 (4th Cir. 1960). Accordingly, on the basis of the inadequate record before us, we find petitioner has not established the worthlessness of the Bell, Dickey and Owens notes in 1971, or in any other year. [18]Rule 142(a). *168 Seaton Notes
Petitioner claims a bad debt deduction of $256,207.30 in connection with the Seaton notes. In 1969, bank examiners of the State of Missouri ordered the removal of the Seaton notes from the Missouri banks. On November 5, 1969, in exchange for petitioner's promise to pay off the Seaton notes, the Seatons gave petitioner a security interest in approximately 1,036 acres of real property. Rather than paying off the Seaton notes, petitioner caused the Missouri banks to assign the Seaton notes to the Chillicothe bank in return for the Chillicothe bank's payment of $274,764.43 to the Missouri banks. Petitioner contends that subsequent thereto he transferred $256,207.30 to the Chillicothe bank as payment on the Seaton notes. The security interest given to petitioner by the Seatons on November 5, 1969, secured any debt which Seaton may have owed petitioner in connection with the Seaton notes. [19] Petitioner has submitted no evidence indicating that the value of the secured property was less than the amount of debt allegedly owed him by Seaton. Accordingly, we find petitioner has not established the worthlessness of such alleged debt. [20]Rule 142(a). *169 Appleton Transactions
Petitioner claims a bad debt deduction on the basis of several transactions he engaged in with Edward Appleton, a business associate. Petitioner alleges that he made "loans" to Appleton under the following circumstances: by paying the full amount on a note in the face amount of $70,500 on which petitioner and Appleton were jointly and severally liable, by making transfers in the aggregate amount of $13,230 to Appleton on May 5, 1971, by making a transfer of $1,237.03 to Appleton on May 25, 1971, and by making a transfer of $1,000 to Appleton on June 29, 1971. The record contains copies of checks and bank records evidencing certain of these transfers to Appleton. [21] None of these transfers, however, are supported in the record by notes or any of the other customary indicia of indebtedness. Absence of any indicia of indebtedness raises doubt whether these transfers to Appleton were in the context of a debtor-creditor relationship. See Hyde v. Commissioner,64 T.C. 300 (1975). Similarly, the note on which petitioner and Appleton were jointly and severally liable is contained in the record, but there is no evidence corroborating petitioner's *170 assertion that he made any payments on such note on behalf of Appleton. Petitioner bears the burden of proof that Appleton owed him a valid debt in connection with these transactions. Rule 142(a). On the basis of the inadequate record before us, we are unable to find that burden has been met. [22]
Even assuming these transactions created valid debt, we find that petitioner would not be entitled to a deduction. Petitioner testified that Appleton's "overall situation" was dismal in 1971. However, petitioner's unsupported conclusion that such debts became worthless is insufficient proof. Bryan v. Commissioner,32 T.C. 104 (1959), affd. 281 F.2d 238 (4th Cir. 1960). In fact, the record indicates that petitioner continued to engage in business transactions with Appleton after 1971. Petitioner sued Appleton in 1973 alleging that he had loaned money to Appleton on several *171 occasions between 1965 and 1973. This evidence of continued dealings after 1971 belies petitioner's claim of worthlessness. Rollins v. Commissioner,32 T.C. 604 (1959), affd. 276 F.2d 368 (4th Cir. 1960). Accordingly, in connection with the Appleton transactions, we are unable to find petitioner has sustained his burden of proof on the element of worthlessness. Curtas and Walters
In January 1971, under pressure from the Administrator of National Banks, petitioner, together with stockholders Curtas and Walters, sold his stock in the Florida banks. Petitioner had granted John Dickey (Dickey) a power of attorney to carry out the sale. Dickey deposited petitioner's proceeds from the sale in a trust account with the Pan American Bank of Miami. Checks made payable to Curtas and Walters were drawn on that trust account by Dickey. Petitioner contends that he did not authorize the writing of these checks and, consequently, a debt was owed him by Curtas and Walters as a result thereof. The refusal by Curtas and Walters to repay such alleged debt is the basis of petitioner's bad debt claim of $131,826.63. Even assuming valid debt was owed petitioner *172 by Curtas and Walters, [23] petitioner is not entitled to a deduction of any such debt for worthlessness. In order for us to ascertain whether a debt is worthless, the record must contain facts upon which we can make an independent judgment. Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. 310 F.2d 815 (3d Cir. 1962). Petitioner has proffered only his unsupported testimony that he was unable to secure payment from Curtas and Walters. Petitoner testified that he engaged an attorney to pursue collection. However, the record contains no documentary evidence of such efforts. Furthermore, no suit was filed by petitioner against Curtas or Walters. *173 Regarding the financial conditions of Curtas and Walters, petitioner testified that Curtas and Walters went into bankruptcy. Once again, petitioner has submitted no documentary evidence to support his assertion. Moreover, petitioner testified that the bankruptcies occurred after 1971.We simply cannot determine from the record that Curtas and Walters were unable to pay any debt allegedly owed petitioner. Curtas and Walters each received at least $250,000 from the sale of their stock in the Florida banks in 1971. Together with petitioner, they invested such proceeds in a Florida bank holding company. Petitioner has submitted no evidence of the financial status of that company at the close of 1971. Finally, in May 1972, petitioner's accountant sent petitioner a schedule of debts allegedly owed petitioner by Curtas and Walters in connection with the sale of the Florida banks. We find it significant that the schedule does not in any way refer to such alleged debts as being uncollectible. Accordingly, based on the record before us as discussed herein, we are unable to find petitioner has established the worthlessness of any alleged debt owed him by Curtas and Walters. *174 OHA Farms
Petitioner claims bad debt deductions of $120,182.92 in connection with OHA Farms. In the latter part of 1971, petitioner paid off certain liabilities of OHA Farms. [24] Among the stockholders of OHA Farms was petitioner's wife. Petitioner did not receive notes or other evidence of indebtedness in connection with these advances. This raises doubt that a valid debt was created. See Hyde v. Commissioner,64 T.C. 300 (1975). Further doubt is raised by the fact that on December 31, 1971, OHA Farms transferred its principal assets, consisting of approximately 1,450 acres of farmland, to petitioner's wife. Then in 1972, this farmland was transferred to a corporation owned solely by petitioner and his wife. Petitioner testified that the other stockholders of OHA Farms agreed to distribute the farmland to his wife if petitioner "would take over the liquidation of [OHA Farms]." We do not believe that a corporation would pay so much to have someone take charge of its liquidation. It strikes us as more likely that the distribution was related, at least in major part, to petitioner's earlier advances. In such case, the advances to OHA Farms may *175 have been in the nature of contributions to capital. A contribution to capital is not a valid debt for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. Accordingly, we find that petitioner has failed to sustain his burden of proof that the advances to OHA Farms created valid debt. Even assuming the existence of valid debt, we would view the distribution of the farmland to petitioner's wife as having been in satisfaction of that debt. The record contains no evidence indicating that the farmland was of lesser value than such "debt". Accordingly, petitioner would not be entitled to a deduction for worthlessness. Additions to Tax
Petitioner never filed a 1971 Federal income tax return. Section 6651(a) provides for an addition to tax for failure to file a *176 timely return unless the taxpayer can affirmatively show that such failure was due to reasonable cause. Bagur v. Commissioner,66 T.C. 817, 824 (1976), remanded on other issues 603 F.2d 491 (5th Cir. 1979). Petitioner proffered only his unsupported testimony that he was unable to file a return in 1971 because his accountant was holding his records until petitioner paid a certain fee. Unavailability of records is generally not reasonable cause for failing to file a timely return. See Electric & Neon, Inc. v. Commissioner,56 T.C. 1324 (1971), affd. 496 F.2d 876 (5th Cir. 1974). Furthermore, petitioner's testimony is contradicted by the fact that petitioner's accountant provided substantial services on related matters to petitioner in May 1972. Accordingly, we sustain respondent's determination that petitioner is liable for the section 6651(a) addition to tax for 1971. Section 6653(a) provides for an addition to tax if any part of an underpayment is due to negligence. Section 6001 requires a taxpayer to maintain and make *177 available records sufficient to establish the amount of gross income and deductions required to be shown by him on his tax returns. See secs. 1.6001-1(a) and 1.6001-1(e), Income Tax Regs. Where a taxpayer fails to maintain or make available such records, the negligence addition may apply. Zivnuska v. Commissioner,33 T.C. 226 (1959). Despite the mass of documents submitted herein, it was often impossible to reconstruct from such documents many of the transactions bearing on petitioner's 1971 income tax liability. Petitioner's records were clearly inadequate and petitioner offered no justification for not keeping adequate records. Furthermore, as discussed above, petitioner never filed a return for the taxable year 1971. Such failure provides further support for the imposition of an addition to tax for negligence. Lord v. Commissioner,60 T.C. 199, 210 (1973), modified on other issues 525 F.2d 741 (9th Cir. 1975). Accordingly, we sustain respondent's determination that petitioner is liable for the section 6653(a) addition to tax for 1971. In view of the foregoing, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. The Missouri banks: Harris Banking Co., Bank of Craig, Bank of Otterville, Hopkins State Bank, and Security State Bank. The Florida banks: University National Bank and Commercial National Bank. ↩
3. The Bank of Craig was not insured by the F.D.I.C.↩
4. Petitioner's aggregate share of cash and notes from the sales was $352,462.38 and $711,247.52, respectively.↩
5. Petitioner also presented evidence of a note executed by Bell on July 21, 1962, in the face amount of $7,968.75 in favor of Security State Bank, and endorsed to petitioner on December 18, 1970. We, however, make no determination with respect to this note because petitioner's claim for a bad debt deduction is based solely on the note dated September 16, 1969.↩
6. Petitioner also agreed to pay off certain "open cash obligations" of Seaton Construction Company in return for the note. Since petitioner makes no claim based on these obligations, we restrict our discussion herein to the Seaton notes. In any event, petitioner appears to have been reimbursed pursuant to a bonding agreement for any payments he may have made on such obligations. ↩
7. Seaton conveyed to petitioner by warranty deed approximately 1,000 acres of real property. By supplementary agreement, petitioner granted Seaton a right to redeem such real property upon the Seatons' repayment of amounts owed to petitioner in connection with the Seaton notes. Although highly irregular, this arrangement served the function of a security interest.↩
8. The Administrator of National Banks determined that the banks' portfolio contained unsatisfactory amounts of "insider" loans.↩
9. OHA Farms was a Missouri corporation doing business as Investing Farms Company.↩
10. Bad debt evidenced by a "security" is generally governed by sec. 165(g). Sec. 165 and sec. 166 are mutually exclusive. Spring City Co. v. Commissioner,292 U.S. 182↩ (1934). 11. Business debts and nonbusiness debts are subject to different treatment under sec. 166↩. Because it is unnecessary to the determinations herein, we make no findings as to whether any of petitioner's "debts" constitute business or nonbusiness bad debts. 12. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
13. Petitioner aggregated the amount of his claims on the Dickey and Owens notes in his petition.↩
14. See Dean v. Commissioner,T.C. Memo. 1970-75↩. 15. See Suman v. Commissioner,T.C. Memo. 1967-84↩. 16. The fact that the banking authorities may have required the removal of these notes from the Missouri banks is not evidence of worthlessness. The banking authorities were concerned with the "insider" status of such notes, not their worthlessness. ↩
17. In fact, petitioner's own testimony implies that Dickey was capable of paying off the Dickey note. Petitioner stated that I was left holding the bag on [Dickey's note] because [Dickey] was bound and determined that he wasn't going to be nicked as one of the selling stockholders of one of the [Missouri] banks that we sold and also pay his loan. This testimony indicates that Dickey was unwilling, rather than unable, to pay off the Dickey note. ↩
18. Respondent contends petitioner has not established any basis in these notes and consequently, is not entitled to a deduction under sec. 166. See sec. 1.166-1(d), Income Tax Regs. We make no finding with respect to petitioner's basis in these notes because it is unnecessary to the determination of this case. Similarly, because we are unable to ascertain the worthlessness of these notes, it is unnecessary for us to consider respondent's argument that petitioner would not be entitled to a bad debt deduction if these notes were already worthless when petitioner acquired them. See Eckert v. Burnet,283 U.S. 140 (1931); but compare, Martin v. Commissioner,38 T.C. 188↩ (1962).
19. Petitioner testified that: Seaton had said if we'd get the pressure off of him that he would give a warranty deed, he and his wife, on it seems to be like it was a thousand plus acres of land as additional security to all his notes * * *. ↩
20. Petitioner testified that: [I] tried to collect and have [Seaton] move off the land so we could take it and sell it along with any other collateral that had any value or existed that we would find, and [Seaton] refused to cooperate and then [I] did later file suit down the line against [Seaton] and the judgment was against [me].
Petitioner does not explain how such judgment could have been against him if the Seatons owed valid debt to petitioner. This testimony raises serious doubt that valid debt was owed petitioner by the Seatons. We, however, make no finding on such fact because it is unnecessary to the determination of this issue.↩
21. Petitioner submitted two copies of the same check in support of two of the alleged transfers on May 5, 1969. ↩
22. See Grace v. Commissioner,T.C. Memo. 1977-390↩.
23. Petitioner submitted copies of several checks drawn on the trust account. Several were payable to persons other than Curtas and Walters and, consequently, are not at issue. Four of the checks were payable to Curtas and Walters in the total amount of $70,772. Two of the checks payable to Curtas and Walters, in the total amount of $32,848, have the word "loan" handwritten thereon. We make no finding whether any of these checks created valid debt owed to petitioner because it is unnecessary to the determination of this issue.↩
24. Although respondent concedes that certain amounts were paid by petitioner on behalf of OHA Farms, respondent disputes petitioner's claim that the amount of such payments totalled $120,182.92. We make no finding on this fact because it is unnecessary to the determination of this issue.↩