GORDON I. HYDE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JANET C. HYDE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9044-72, 9045-72.     Filed May 28, 1975.

*J. Jay Bullock* and *Platte E. Clark,* for the petitioners.
*Craig D. Platz,* for the respondent.

FAY, *Judge:* Respondent determined the following deficiencies in the Federal income tax of petitioners Gordon I. and Janet C. Hyde in these consolidated proceedings:

| | |
|---|---|
| 1967 | $23,120.49 |
| 1968 | 46,984.98 |

Concessions having been made, it remains for us to decide: (1) The value of real estate in which Gordon Hyde acquired an interest; (2) whether certain deductions claimed by Gordon Hyde for 1968 under sections 163 and 164[1] were excessive; (3) whether a statutory redemption fee is interest within the meaning of section 163; (4) whether Gordon Hyde recognized gain on the sale of certain shares of stock in 1968; (5) whether

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Gordon Hyde was entitled to claim a bad debt deduction for 1968; and (6) whether Janet Hyde is entitled to relief under section 6013(e).

### FINDINGS OF FACT

Certain facts have been stipulated and are found as stipulated.

Petitioners Gordon I. (Gordon) and Janet C. (Janet) Hyde, formerly husband and wife, filed joint Federal income tax returns for 1967 and 1968 with the District Director of Internal Revenue, Salt Lake City, Utah. They were divorced on June 16, 1971. They were residents of Salt Lake City when the petitions herein were filed.

At all times relevant, Gordon was a practicing attorney. Among his clients were UMC Motor Club, Inc. (UMC), and its affiliates. UMC was a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake City. All of the outstanding shares of capital stock in UMC were owned by the family of Sam and Donna Arge, husband and wife, until May 1967 when the Arges sold all their shares to Robert Bryson (Bryson) and a group of undisclosed persons represented by him.

At the time of the sale UMC held title to a house at 1955 Bryan Avenue in the El Rey Park subdivision of Salt Lake City. The house had been constructed by the Arges in 1964-65 at a cost well in excess of $100,000 and had then been conveyed by them to UMC. The house was a marked overimprovement for the area in which it was located; for in 1964-65 houses in the vicinity of 1955 Bryan Avenue were priced in the $35,000 range.

While the Arges retained control of UMC, they maintained the house on Bryan Avenue as their residence. But when Bryson and his associates acquired the capital stock of UMC, they decided to sell the Bryan Avenue property because it served no useful function in the operation of the motor club. When Bryson and his associates learned that petitioners were disposed to purchase the house, they agreed to let them occupy it, pending their purchase of the property. The contemplated transaction was never consummated, however, for the property had twice been mortgaged by the Arges; and UMC lacked the funds necessary to discharge the several debts which encumbered it.[2] Consequently,

---

[2] Late in the fall of 1968 a receiver of the assets of UMC was appointed by the District Court of Salt Lake County.

on September 15, 1967, the first mortgagee, the Equitable Life Assurance Society of the United States (Equitable), initiated foreclosure proceedings in the District Court of Salt Lake County. Under these circumstances, UMC agreed to convey its interest in the property to Gordon, gratis;[3] for Gordon still wished to acquire the house, and as UMC's successor in interest he would be accorded the opportunity to redeem it under the law of Utah.

The conveyance was effected by delivery of a quitclaim deed on December 1, 1967.[4] On that date the property was subject to encumbrances in the following amounts:

| *Mortgagee* | *Encumbrances* |
| --- | --- |
| Equitable: | |
| Equitable's mortgage principal balance | $39,289.68 |
| Interest on mortgage principal from 5/1/67 to 9/15/67 at 6% and from 9/15/67 to 12/1/67 at 9% | 1,633.74 |
| 1966 property taxes including interest to 9/15/67 when paid by Equitable | 1,688.31 |
| Interest on Equitable's payment of 1966 property taxes 9/15/67 to 12/1/67 | 31.95 |
| Title search by Equitable | 50.00 |
| Attorney's fees incurred by Equitable | 875.00 |
| Costs of suit incurred by Equitable | 34.20 |
| | 43,602.88 |
| Promotions Unlimited, Inc. | 4,500.00, plus accrued interest |

On April 16, 1968, the court entered a decree of foreclosure and ordered the Bryan Avenue property to be sold by the sheriff. At the sheriff's sale of May 14, 1968, Equitable purchased the property for the amount of its judgment plus costs:

---

[3] Consideration of $10 was formally stated in the deed.

[4] Four days prior to the conveyance, UMC had suspended its operations under orders from the commissioner of insurance. In an effort to salvage their investment in the motor club, Bryson and his associates sought to induce the Midwest Insurance Co. (Midwest) to purchase 80 percent of the stock of UMC outstanding. A contract of sale was executed on Dec. 20, 1967, by National Enterprises, Inc., a corporation organized by two representatives of Midwest to make this purchase. This contract was later canceled, however, at the insistence of the purchaser.

Attached to the contract of sale was a schedule of UMC's liabilities. The schedule indicated that the motor club was indebted to Gordon in the amount of $7,124.37 for cash loans. No such liability was listed on a balance sheet dated Nov. 30, 1967.

| | |
|---|---|
| Mortgage principal balance _____ | $39,289.68 |
| Interest on mortgage principal: | |
|    5/1/67 to 9/15/67 at 6% _____ | 891.27 |
|    9/15/67 to 4/16/68 at 9%_____ | 2,063.50 |
| 1966 property taxes including | |
|    interest and penalties to 9/15/67 | |
|    when paid by Equitable_____ | 1,688.31 |
| Interest on Equitable's payment | |
|    of 1966 property taxes | |
|    9/15/67 to 4/16/68_____ | 89.51 |
| Title search_____ | 50.00 |
| Attorney's fees_____ | 3,230.00 |
| Cost of suit _____ | 34.20     $47,336.47 |
| | |
| Interest on judgment | |
|    4/16/68 to 5/14/68 at 8%_____ | 290.50 |
| Sheriff's fees and costs _____ | 60.00 |
| | 47,686.97 |

Within 6 months of the sheriff's sale, Gordon exercised his right of redemption by paying Equitable $50,047.99:

| | |
|---|---|
| Equitable's bid at the foreclosure sale_____ | $47,686.97 |
| Plus:  1967 property taxes paid | |
|        by Equitable subsequent | |
|        to foreclosure sale, plus interest _____ | 1,854.80 |
|        Statutory 6% redemption fee _____ | 2,861.22     $52,402.99 |
| | |
| Less:  Agreed reduction in above | |
|        $3,230 judgment attorney's | |
|        fees to $875 _____ | 2,355.00 |
| | 50,047.99 |

Pursuant to the redemption, he had Equitable assign its interest in the property to Ruth W. Soren (Soren), his secretary and nominee.

On September 24, 1970, Soren executed a trust deed to the property naming Zions First National Bank (Zions) as trustee and beneficiary. The deed secured a note in the amount of $55,000, executed by Soren and Gordon. Payments on the note were not made in compliance with its terms; and therefore on November 22, 1971, Zions obtained an order in the District Court of Salt Lake County authorizing a private trust deed sale of the property.

Relying on an estimate as to the value of the property made by their real estate department, the management of Zions listed the house with a real estate broker for $75,000. The property was

purchased for this amount in January of 1973.[5]

While in residence at 1955 Bryan Avenue, Gordon made improvements to the property at a cost of approximately $10,000. These included the installation of carpeting, a dishwasher, and a stereo system. When he vacated the house Gordon removed these items. Subsequently, while the house was unoccupied, it was vandalized. Zions incurred about $1,750 in cleaning and repairing the house prior to its being resold, but did not replace the improvements which Gordon had removed.

In the early part of 1968 Gordon was interested in procuring a loan. At the time he was assisting a client, Roy Collard (Collard), in obtaining from Pacific Air Transport, Inc. (Pacific), the release of 13,333 shares of stock in that corporation. Collard agreed to lend Gordon either the Pacific shares or the proceeds of their sale if his efforts to obtain their release proved successful. In May 1968 the shares were released; and Gordon began to sell them through his brokerage account, thereby creating a fund from which he might borrow. Before Gordon's obligation to Collard arising out of this transaction could be discharged, several disputes unrelated to it arose between them. Gordon hoped that a single settlement of all his dealings with Collard could be effected; Collard, however, proved unwilling to negotiate such a settlement, claiming by way of explanation for his refusal that he was under investigation by the Internal Revenue Service.

On their joint return for 1967, filed on or before April 15, 1968, petitioners reported gross income of $50,644.54. On their joint return for 1968, filed on September 15, 1969, they reported gross income of $150,595. Statutory notice of deficiency for 1967 was dated November 22, 1972; statutory notice of deficiency for 1968 was dated September 11, 1972.

OPINION

We have first been asked to decide whether Gordon recognized any income on the acquisition of the Bryan Avenue property.

If property subject to an encumbrance is transferred by one not personally liable on the secured indebtedness, then, should the

---

[5] On an average, the value of single-family dwellings in Salt Lake City increased by 50 percent in the period 1967-73. This appreciation affected the value of property in all price ranges. The appreciation in value would have tended to be more limited, however, were the property in question overimproved initially.

fair market value of the property exceed the amount of the encumbrance, the transferee may recognize income on the transaction in the amount of the excess. Whether income is in fact recognized will depend upon the circumstances under which the transaction is effected. Cf. *Crane v. Commissioner*, 331 U.S. 1 (1947).

Gordon acquired title to the Bryan Avenue property upon receipt of a quitclaim deed on December 1, 1967. *Singleton v. Kelly,* 61 Utah 277, 212 P. 63 (1922). The property was then subject to encumbrances of no less than $48,102.88. The fair market value of the property at the time of the conveyance is in controversy. In attempting to determine that value, we have considered the following factors: The price at which the property was sold by Zions in 1973; the improvements which were made to the property between the conveyance to Gordon and the sale by Zions; the extent to which the condition of the property deteriorated in that period; the rate at which the value of real estate in Salt Lake City appreciated between 1967 and 1973; and the effect which the location of the house may have had upon appreciation in its value during that period. We have concluded that on December 1, 1967, the fair market value of the property cannot have exceeded $60,000.

On their return filed for 1967 petitioners failed to report any income as having been recognized upon Gordon's receipt of an interest in the Bryan Avenue property. Whether any was in fact recognized we need not decide owing to the operation of the statute of limitations.

Ordinarily, a deficiency in Federal income tax must be assessed within 3 years after the return is deemed to have been filed. Sec. 6501(a). If a notice of deficiency is mailed to the taxpayer within that 3-year period pursuant to section 6212, this will suffice to suspend the running of the period of limitations. Sec. 6503(a). Petitioners' return for 1967 is deemed to have been filed on April 15, 1968. Sec. 6513(a). Statutory notice respecting that year was not mailed until November 22, 1972. The assessment and collection of any tax which may be owing for 1967 are therefore time-barred.[6]

---

[6] In view of the value of the property on Dec. 1, 1967, and the extent to which it was encumbered at that time, Gordon could not have recognized income in excess of 25 percent of $50,644.54 when he acquired his interest in the property. See sec. 6501(e).

When Gordon redeemed the Bryan Avenue property in 1968, the following items were included in the amount which he paid Equitable:

| | |
|---|---|
| Interest on the mortgage principal: | |
| 5/1/67 to 9/15/67 at 6% _____ | $891.27 |
| 9/15/67 to 4/16/68 at 9% _____ | 2,063.50 |
| 1966 property taxes including interest and penalties to 9/15/67 when paid by Equitable _____ | 1,688.31 |
| Interest on Equitable's payment of 1966 property taxes 9/15/67 to 4/16/68_____ | 89.51 |
| Interest on the judgment 4/16/68 to 5/14/68 at 8% _____ | 290.50 |
| 1967 property taxes paid by Equitable subsequent to the foreclosure sale, plus interest _____ | 1,854.80 |

Petitioners claim that Gordon is entitled to deductions in the full amount of these items for 1968. The items are in fact deductible by Gordon only to the extent they accrued on or after December 1, 1967. To the extent they accrued prior to that date, they must be capitalized. Sec. 164(d); *Holdcroft Transp. Co. v. Commissioner*, 153 F.2d 323 (8th Cir. 1946), affg. a Memorandum Opinion of this Court.

Petitioners also claim that Gordon is entitled to a deduction under section 163 in the amount of a statutory fee of $2,861.22, paid to Equitable in connection with the redemption of the property.[7] We agree.

A mortgagor or his successor in interest is generally privileged to discharge a secured indebtedness on its maturity or at any time thereafter prior to foreclosure. Moreover, in Utah, he or his successor in interest is privileged to redeem the property within 6 months of the foreclosure sale by paying the purchaser the amount of his bid, plus a fee fixed by statute. As this statutory fee

---

[7] Utah Code Ann. sec. 78-37-6 (1953).

Right of redemption— * * * Sales of real estate under judgments of foreclosure of mortgages and liens are subject to redemption * * *

Rule 69(f), Utah R. Civ. P., 9 Utah Code Ann. (1953):

(1) Who May Redeem. Property sold subject to redemption, or any part sold separately, may be redeemed by the following persons or their successors in interest: (1) The judgment debtor; * * *

* * *

(3) Time for Redemption, Amount to be Paid. The property may be redeemed from the purchaser within six months after the sale on paying the amount of his purchase with 6 per cent thereon in addition * * *

is essentially the consideration paid for an effective extension of the mortgage loan,[8] it constitutes interest within the meaning of section 163. *Court Holding Co.*, 2 T.C. 531, 536 (1943), revd. on other grounds 143 F.2d 823 (5th Cir. 1944), revd. 324 U.S. 331 (1945); *Western Credit Co.*, 38 T.C. 979 (1962), affd. per curiam 325 F.2d 1022 (9th Cir. 1963).[9]

Under the terms of his agreement with Collard respecting the latter's Pacific shares, Gordon was authorized to sell the shares on Collard's behalf and then to borrow from the proceeds. None of the indebtedness to Collard which Gordon incurred by reason of this transaction was forgiven in 1968. Therefore Gordon recognized no income on the transaction in that year. Cf. *Allen Tobey*, 26 T.C. 610, 616-617 (1956).

Petitioners maintain that obligations of $7,124.37, purportedly owed to Gordon by UMC and affiliated corporations, became worthless in 1968. It is a matter of controversy whether the cash advances alleged to underlie these obligations were in fact made. The burden of proving that they were made is upon petitioners.

The testimony relevant to this issue given by the various witnesses is rife with contradictions. The relevant documentary evidence is inconclusive.[10] Of singular significance to the Court is that no note attesting to the alleged indebtedness was introduced at trial. We are reluctant to conclude that an attorney advanced over $7,000 in cash to a client without insisting upon the execution of a note, especially in a case such as this where the client was in difficult financial straits. We therefore hold that petitioners have failed to sustain their burden of proof on this issue.

Finally we are asked to decide if Janet is entitled to relief under section 6013(e).[11] Clearly she is not; for items of gross

---

[8] 3 Powell, Real Property, pars. 457, 466, 470; 5 Tiffany, Real Property, secs. 1528, 1530 (3d ed.)

[9] *Kenneth W. Doehring*, T.C. Memo. 1974-234.

[10] Copies of the balance sheet of Nov. 30, 1967, and the contract of Dec. 20, 1967, were introduced.

[11] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL. Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

* * *

income in excess of 25 percent of the gross income reported were not improperly omitted from either of the returns filed for the years in issue.

*Decisions will be entered under Rule 155.*

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.