STEPHEN L. HOFFMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hoffman v. Commissioner
Docket No. 7253-77.
United States Tax Court
T.C. Memo 1980-431; 1980 Tax Ct. Memo LEXIS 159; 41 T.C.M. (CCH) 57; T.C.M. (RIA) 80431; September 25, 1980, Filed Eugene O. Cobert, for the petitioner. Barry C. Feldman, for the respondent. *161 SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax and an addition to tax under section 6653(b), I.R.C. 1954, [1] for the years and in the amounts as follows: Addition to Tax
Deficiency in
I.R.C. 1954
Year
Income Tax
Sec. 6653(b)
1967
$8,946.92
$4,473.46
1968
677.04
1970
88.85
After concessions by petitioner, the issues remaining for decision are (1) whether petitioner is entitled to a business bad debt deduction under section 166(a) for payments he claims to have made pursuant to an alleged guarantee of a corporate debt; (2) whether petitioner is entitled to a deduction under section 162 for payments made in compromise of a judgment against petitioner as the agent of an undisclosed principal for breach of contract where the principal defaulted; and (3) whether a check received by petitioner from an attorney should be included in his gross income as a forwarding fee. FINDINGS OF FACT *162 Some of the facts have been stipulated and are found accordingly. Petitioner, Stephen L. Hoffman, resided in Fort Lee, New Jersey, at the time of the filing of his petition in this case. [2] Petitioner filed a joint Federal income tax return with his wife, Pearl Y. Hoffman, for each of the calendar years 1967, 1968, and 1970 with the Office of the Internal Revenue Service at New York, New York. Petitioner was a practicing attorney in New York City during the years in issue, and he currently maintains an office in Manhattan. At the time of trial, petitioner had been admitted to the New York bar for 48 years. On behalf of a client named Steve Schwartz, petitioner formed a corporation entitled Concerts at Shea, Inc. (Concerts). Concerts was incorporated in late 1965 or early 1966. Initially, Mr. Schwartz was the president and sole shareholder and petitioner was named as the treasurer. At a later date Harry Bloomfield became the sole shareholder *163 and president of Concerts. Petitioner remained the treasurer. Petitioner never had any type of equity or ownership interest in Concerts. Concerts was incorporated for the purpose of producing concerts at Shea Stadium in New York, New York. It had scheduled a performance at Shea Stadium for June 26, 1966, but began to have financial difficulties in May or early June. Mr. Bloomfield and petitioner were advised by Concerts' bank, Franklin National, that it would no longer issue letters of credit to the entertainers scheduled to perform unless Concerts provided additional capital to secure them. The problem was resolved by a deposit of funds with the bank and the concert was held as scheduled although it was not financially successful. On June 23, 1966, petitioner received a call from Thomas P. F. Hoving who was the New York City Commissioner of Parks. Mr. Hoving stated that he would not allow the concert to be held on June 26, 1966, unless the city was given a deposit of $5,000 in cash to protect it in the event that there was any damage to Shea Stadium. Petitioner called Mr. Schwartz and shortly thereafter the money was delivered to petitioner's law office. Petitioner did *164 not recall signing any document upon his receipt of the cash. At about 9:00 that evening, he took the $5,000 and delivered it to Mr. Hoving who acknowledged the receipt of the money in writing as follows: 23 June 1966, 9:25 P.M. Received $5,000 in cash from Stephen L. Hoffman, treasurer of Concerts-at-the-Shea, Inc., as security deposit for the Batman Concert. /S/ Thomas P. F. Hoving, Commissioner of Parks /S/ Henry J. Stern, Executive Director, Dept. of Parks
On July 11, 1966, petitioner on behalf of Concerts filed a general assignment for the benefit of creditors. He did so with the consent of Mr. Bloomfield after realizing that all of the available money had been paid out to the entertainers who performed at the June 26, 1966, concert. Petitioner had a client named Champagne Towers (Champagne). He had performed substantial legal services over a period of years prior to 1967 for Champagne, including services rendered in connection with a loan obtained by it from the Teamsters pension fund. On or about March 1, 1967, petitioner received payment for these services in the form of 12 checks totaling $27,000. The checks were dated and were for the amounts as follows: *165 Check No.
Date
Amount
2446
March 1, 1967
$10,000
1174
April 14, 1967
3,000
1175
April 21, 1967
2,000
1217
May 9, 1967
1,000
1218
May 16, 1967
1,000
1219
May 23, 1967
1,000
1220
May 30, 1967
1,500
1221
June 6, 1967
1,500
1222
June 13, 1967
2,000
1223
June 20, 1967
1,750
1224
June 27, 1967
1,750
1225
July 5, 1967
500
All of the checks were signed by Seymour Flax, who was the owner of Champagne and the only endorsement that appeared on the back of the checks was petitioner's signature. Petitioner also received $1,492.30 from various clients for legal services in 1967. Overall, the fees received from Champagne and his other clients totaled $28,492.30, none of which were reported on petitioner's income tax return for the taxable year 1967. On July 9, 1973, petitioner was indicted under section 7201 for tax evasion for the taxable year 1967. On November 8, 1973, petitioner was convicted of income tax evasion under section 7201 on a plea of guilty to the indictment.On December 12, 1973, he received a two-year suspended sentence and a $1,000 fine. Petitioner did not lose his license to practice law in New York, but he was censured *166 by the Appellate Division for his conviction. In early 1954, petitioner represented a client at a U.S. Government auction sale in Ohio. He made the winning bid but registered in his own name rather than as a representative of his client. Later, the client defaulted and a judgment was entered against petitioner in favor of the United States for $23,412.52 plus interest. This judgment was later compromised by the parties and reduced to $5,000. In 1967, petitioner paid $1,000 of the amount owed. Louis Kaplan was a friend and an associate of petitioner in his law office. A reciprocal arrangement existed whereby they would refer clients to each other and it was their custom that a forwarding fee would be paid to the referring attorney. Petitioner's daughter, Jill, and her husband Louis Schwartz, were involved in an automobile accident. They were hit head-on by a car traveling in the wrong direction in their lane, and Jill was seriously injured. As the other driver was uninsured, Jill and her husband wanted to sue to recover for their damages. Petitioner asked Mr. Kaplan to handle the case and he agreed. Mr. Kaplan's representation resulted in a judgment which awarded $10,000 *167 to Jill and $7,500 to her husband and he sent the checks directly to them along with a statement of legal fees for $4,550. Later, petitioner found out about the amount of the bill and suggested that he did not want Mr. Kaplan to charge a regular fee because he wanted his daughter to receive the maximum benefit from the judgment. In response, Mr. Kaplan sent a check for $2,275 to petitioner. Petitioner had told Mr. Kaplan that due to the severity of his daughter's injuries, any reduction which Mr. Kaplan would make in his bill to petitioner's daughter would go directly to her. About two days after petitioner received the check from Mr. Kaplan, he gave it to his daughter. Respondent, in his notice of deficiency for the calendar year 1967, increased petitioner's taxable income by $28,492.30 and disallowed a deduction of $1,000 claimed by petitioner with the following explanations: (a) It is determined that you received legal fees in 1967 in the sum of $28,492.30 from clients, as shown below, which were not reported on your income tax return. * * * (c) It is determined that a miscellaneous expense deduction of $1,000.00, claimed in 1967 as an itemized deduction, is not allowable *168 as you have not established that it represents an ordinary and necessary expense, or was expended for the purpose designated. * * * Respondent increased petitioner's taxable income by $2,275 for the calendar year 1968 and explained that: It is determined that during the year 1968, you received a referral fee from Louis Kaplan in the amount of $2,275.00, which was not reported on your income tax return; * * * OPINION Petitioner admits that he improperly failed to report the $27,000 received from Champagne as income in 1967, but contends that the reason he did not do so was that he believed that he was entitled to an offsetting business had debt deduction based on his payment of $27,000 under a purported guarantee of two loans, one of $19,000 and one to $5,000, to Concerts from a loan shark named "Eddie." It is respondent's position that petitioner has failed to establish the existence of a loan or that he was the guarantor of such debt and that even if he did prove the existence of the loan, petitioner has failed to establish that he made any payments under the obligation in 1967. We agree with respondent. [3]
*169 While the record indicates that Concerts received some funds from some source to enable it to hold its June 26, 1966 concert, it does not show that the funds were from a loan. Section 166(a)(1)[4] provides that "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." Section 1.166-1(c), Income Tax Regs., states that only bona fide debts will qualify for a deduction under section 166 and "a bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." *170 Petitioner has the burden of proving that respondent's determination was erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In order to do so in this case, petitioner must first establish that a valid and enforceable debt existed between Concerts and "Eddie." However, petitioner failed to introduce into evidence the purported debt instrument for $19,000 which he testified that he had signed. He did not even testify that he signed any paper with respect to the additional $5,000. The instrument itself is particularly important in this case as petitioner admitted that it was just a piece of paper and not a normal document. In fact, petitioner later testified that he did not even know what type of writing he had signed, or if it was a note, or to whom it was payable. If petitioner could not obtain the paper he claimed to have signed, there were alternative means by which he could have proved the existence of a debt. Petitioner was the treasurer of Concerts, and as such he should have had access to the books and *171 records of the corporation which would have listed the debt. Also, petitioner testified that he had signed the papers in behalf of Concerts when it filed for a general assignment for the benefit of creditors. Yet he did not introduce either the corporate books or the assignment documents which would have been a matter of public record and which by their nature must contain a schedule of all of the creditors of Concerts. In addition, petitioner did not present as a witness to corroborate his testimony either Mr. Bloomfield or "Eddie," both of whom would have had firsthand knowledge of the transaction. See Kamborian v. Commissioner,56 T.C. 847, 869 (1971), affd. 469 F.2d 219 (1st Cir. 1972); Hyde v. Commissioner,64 T.C. 300, 307 (1975).Finally, there was no description of the essential terms of the debt, such as its interest rate, maturity date, or repayment schedule. On this record, petitioner has clearly failed to meet his burden with respect to proving the existence of a debt. Even if petitioner had established that there was a valid debt, he still would not be automatically entitled to a deduction. First, petitioner must *172 show that he did guarantee the debt and that after Concerts defaulted, he in fact paid the debt pursuant to his obligation as guarantor.Petitioner testified that he was the guarantor and was "forced" to repay the loan. He explained that he did so by endorsing each of the 12 checks that he had received from Champagne and turning them over to Mr. Schwartz who then, he assumes, somehow cashed the checks and paid "Eddie." However, the checks from Champagne had only petitioner's signature on the back and he failed to explain how they could have been cashed by a third party as he alleged without further endorsement.Petitioner, who had been a practicing attorney for over 30 years, admitted that he did not ask for nor did he receive a copy of the canceled note or any other type of writing which reflected that he had paid the obligation. In fact he stated that he never even inquired of Mr. Schwartz as to whether the indebtedness to "Eddie" had been paid. Therefore, even on the basis of petitioner's own testimony, he did not know whether "Eddie" had been paid. [5] We hold that petitioner has failed to establish that he is entitled to any deduction for a bad debt paid for Concerts. *173 In his petition, petitioner alleged that he was entitled to a deduction under section 162 for payments which he had made in compromise of a judgment rendered against him for breach of contract as the agent for an undisclosed principal who had defaulted. The stipulated evidence indicates that petitioner was entitled to recover from his client any payment made on behalf of the client. Petitioner did not discuss the issue in his brief. It may be that petitioner has abandoned this issue. If not, on the basis of the record we hold that he has failed to show that he is entitled to the claimed $1,000 deduction. The third question presented involves a check for $2,275 which petitioner received from an associate, Louis Kaplan, in connection with a judgment rendered in favor of petitioner's daughter and son-in-law in a suit to recover damages resulting from an automobile accident. Petitioner argues that the check simply represented a reduction in the fee charged to his daughter and her husband and that he immediately passed it on to her. Respondent contends that the check represented a forwarding fee from Mr. Kaplan to petitioner in return for referring the case to him and therefore *174 the amount must be included in petitioner's gross income in 1968. Section 61(a)(1) states that gross income includes "compensation for services, including fees, commissions, and similar items." The issue presented then is whether petitioner actually earned the $2,275 through the performance of services or whether the check was a refund of legal fees to petitioner's daughter and was made out to him simply as an intermediary between Mr. Kaplan and his daughter. If petitioner earned the $2,275, it is income to him even though he assigned it to his daughter. See Lucas v. Earl,281 U.S. 111 (1930). However, on the basis of this record we conclude that the $2,275 was not earned by petitioner but merely given to him to transfer to his daughter. Both Mr. Kaplan and petitioner testified that it was customary for them to refer cases to each other and to pay the referring attorney a forwarding fee. Mr. Kaplan stated that in this instance, he regarded the whole amount of the check in issue as a forwarding fee. Petitioner stated that he regarded the entire amount as a refund to his *175 daughter of part of the fee initially charged her by Mr. Kaplan. There are two factors which show that the check did not represent a referral fee. First, both petitioner and Mr. Kaplan stated that this check was sent to petitioner as a result of a discussion between them, in which petitioner asked Mr. Kaplan to reduce the fee so that his daughter would get more of the benefit of her recovery. Second, the amount of the check represented one-half of the total fee charged by Mr. Kaplan. We find it difficult to believe that a forwarding fee would approach 50 percent of the total fee charged by the attorney who performed the services. For these reasons, we find on the basis of this record that the check for $2,275, although made payable to petitioner, represented a reduction in fees charged by Mr. Kaplan to petitioner's daughter and her husband. Although the check was made out to petitioner, the funds did not belong to petitioner. The funds belonged to petitioner's daughter and her husband. For this reason, the $2,275 is not properly includable in petitioner's income for the taxable year 1968. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise stated.↩
2. The parties stipulated that under Rule 190(b), Tax Court Rules of Practice and Procedure↩, and sec. 7482(b)(2), they designate the United States Court of Appeals for the Second Circuit as the proper venue for an appeal in this case.
3. Petitioner stipulated that he is estopped from denying that the fraud addition under sec. 6653(b)↩ applies to any deficiency which is determined by the Court for the taxable year 1967 due to his plea of guilty to the charge of criminal tax fraud under sec. 7201.
4. Sec. 166 provides in part as follows: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. (f) Guarantor of Certain Noncorporate Obligations.--A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (b) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩
5. If petitioner had in fact guaranteed a debt of Concerts and paid that debt, his deduction would only be of a nonbusiness bad debt under section 166(d)(1)(B) and 166(a)(2). See United States v. Generes,405 U.S. 93, 101-104 (1972); Whipple v. Commissioner,373 U.S. 193, 202-203 (1963); Putnam v. Commissioner,352 U.S. 82 (1956). Petitioner claimed not to fall within the provisions of section 166(d)(2)↩ because he stated he guaranteed the loan to protect a $30,000 to $50,000 fee due him by Concerts. We do not believe petitioner has shown that any such fee was due him. Also, petitioner as treasurer of Concerts knew its financial condition. We do not believe petitioner would have guaranteed debts of $24,000 for a corporation in such poor financial condition, with the small likelihood that as a result he might be able to collect even a $30,000 to $50,000 fee.