DONALD J. CREGG and ALICE M. CREGG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cregg v. Commissioner
Docket No. 12264-78.
United States Tax Court
T.C. Memo 1983-146; 1983 Tax Ct. Memo LEXIS 641; 45 T.C.M. (CCH) 1028; T.C.M. (RIA) 83146; March 21, 1983. Donald J. Cregg, pro se. Maureen T. O'Brien, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent *642 determined deficiencies in petitioners' Federal income taxes of $7,496 and $5,853 for the taxable years 1975 and 1976, respectively. Due to concessions, the issue for decision is whether petitioners may deduct as interest and taxes certain payments made to a construction company by a partnership of which Donald J. Gregg was a partner. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioners, Donald J. Cregg (hereinafter "Cregg") and Alice M. Cregg, husband and wife, resided at Andover, Massachusetts, at the time the petition was filed. Essex Warehouse, Inc. (hereinafter "Essex"), was a Massachusetts corporation organized in 1964 to carry on a food warehousing business. At all relevant times, Cregg and Frank Bennett (hereinafter "Bennett") each owned 50 percent of Essex's outstanding shares. For many years prior to 1973 Essex had rented warehouse facilities scattered throughout several buildings in Lawrence, Massachusetts. In 1973, the favorable long-term lease under which Essex operated was about to expire and Cregg investigated the possibility of having a new warehouse *643 built for use by Essex. Essex's accountant, D. Harold Sullivan (hereinafter "Sullivan") put Cregg in touch with another of Sullivan's clients, Costas G. Psoinos (hereinafter "Psoinos") of Psoinos Construction Co., Inc. (hereinafter "Psoinos Construction"). Psoinos and Antonios Katsikas, as Trustees of the Shawsheen Industrial Realty Trust, owned a parcel of land in Lawrence on which Psoinos Construction hoped to build a building. Psoinos, Cregg, Bennett and Sullivan met and orally agreed that Psoinos Construction would build a warehouse on that land (and an additional parcel Psoinos would acquire) for use by Essex. On September 17, 1973, Sullivan prepared a projected balance sheet and related statements for Essex and affiliated companies for the years ending December 31, 1973, 1974, 1975, 1976 and 1977. These projections showed Essex as the purchaser of a new warehouse and land for $1.4 million. The projections were submitted to the Bay State National Bank of Lawrence, as lead bank for a consortium of other banks, in hopes of interesting these various banks in providing both construction and permanent financing for the proposed warehouse. No written loan application, however, *644 was ever submitted. The Bay State National Bank was favorably disposed toward the warehouse construction project, and at the outset assumed that Essex would be the borrower and owner of the warehouse and land. In attempting to place the proposed construction loan with other banks, however, the Bay State National Bank experienced considerable difficulty. Accordingly, no construction loan was immediately forthcoming. Cregg, Bennett, Sullivan and Psoinos decided to go ahead with construction anyway. Psoinos Construction agreed to start building on condition that it be paid interest on its own funds used in the project. In addition, Psoinos Construction insisted on being reimbursed 1) for any interest it had to pay to third parties in connection with the construction and 2) all real estate taxes it had to pay on the land. Thereafter, Psoinos Construction began building the warehouse, periodically advancing its own funds. On June 27, 1974, Psoinos Construction borrowed $500,000 from the Bay State National Bank, giving back a mortgage to the bank on the two parcels of land on which the warehouse was being built. The proceeds of this loan were used to pay for further construction. *645 On July 19, 1974, the Bay State National Bank wrote Essex informing it that its request for $2 million in financing had been approved. The letter listed Essex as borrower and Cregg and Bennett, individually, as guarantors. The bank requested an immediate $20,000 commitment fee. The fee was paid by Essex. At some point, Bennett and Cregg formed a partnership, B & C Realty (hereinafter the "partnership"). At some point, Essex charged the $20,000 commitment fee it made to the partners' personal accounts. Despite the July 19 letter from the Bay State National Bank, the $2 million construction loan had not been issued as of November 15, 1974, the day Essex moved into the completed warehouse. On November 15, 1974, Psoinos and Antonios Katsikas quitclaimed the land on which the warehouse was built to Bennett and Cregg in return for a $500,000 note from Bennett and Cregg. Also on that day, Sullivan calculated that Psoinos Construction was entitled to $132,187.47 in interest payments, consisting of: $30,812.47 in interest paid to the Bay State National Bank on the construction company's $500,000 loan, $69,875 as interest at 12 percent per annum on Psoinos Construction's funds *646 advanced for the project since January 1, 1974 and $31,500 as interest at 12 percent per annum on the value of land ($350,000) used in the project since March 1, 1974. Sullivan also calculated that Psoinos Construction was owed a total of $6,777.42 for real estate taxes for the period January 1, 1974, to June 30, 1974. Sullivan, on behalf of the construction company, submitted invoices for this interest and taxes and all other costs of construction (amounting to $2,197,544.77 in all) to Bennett and Cregg. Bennett and Cregg, in turn, gave Psoinos Construction a demand note in the amount of these invoices on November 15, 1974. On January 31, 1975, the consortium of banks finally came through with their $2 million loan. The loan was made to Bennett and Cregg, who used the proceeds to pay off most of the November 15, 1974, notes. Bennett and Cregg drafted two new notes for the remainder of the purchase price of the land and buildings. On its partnership return for 1974, B & C Realty claimed deductions for interest and real estate taxes of $171,827 [1] and $9,070, respectively. In his statutory notice of deficiency, respondent disallowed $132,187 of such interest deduction and *647 $7,349 of such real estate taxes deduction on the grounds that these amounts were part of the partnership's purchase price of the warehouse and land on November 15, 1974, and, consequently, had to be capitalized and amortized. OPINION The issue for decision is whether B & C Realty, a partnership of which petitioner is a member, may deduct certain interest and real estate tax payments attributable to the period prior to November 15, 1974. [2]
As respondent views the facts, the partnership purchased the warehouse and land to be used by Essex on November 15, 1974. Consequently, he contends, the interest payments the partnership made to Psoinos Construction that day were merely part of the purchase price which had to be capitalized *648 and amortized over the useful life of the building. Similarly, he argues, any taxes paid on the land attributable to the period before November 15, 1974, were, under section 164(d), imposed on the seller; therefore, to the extent the partnership reimbursed the seller for these taxes, these payments are also to be added to the partnership's depreciable basis. Petitioners, on the other hand, argue that the partnership incurred a binding obligation to reimburse Psoinos Construction for interest and taxes during the period before November 15, 1974, and that therefore, these items of interest and taxes should be allowed to the partnership. Section 163 provides for deduction by a taxpayer of all interest paid or accrued within the taxable year on indebtedness. In the instant case, the $132,187.47 of interest paid by the partnership's note on November 15, 1974, consists of basically two types of interest: 1) interest paid by Psoinos Construction to the Bay State National Bank prior to November 15, 1974, and 2) interest the construction company charged the partnership on the value of the cash and land the construction company "advanced" while the warehouse was being built. With regard *649 to the first type of interest, section 1.163-1(b), Income Tax Regs., provides: (b) Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness. * * * However, only interest paid or accrued on a mortgage on property for the period after the taxpayer becomes the legal or equitable owner of the property is deductible under section 163. Hyde v. Commissioner,64 T.C. 300, 306 (1975). To the extent the interest on the mortgage accrued prior to the date the taxpayer became legal or equitable owner, payments of such interest must be capitalized. Holdcroft Transp. Co. v. Commissioner,153 F.2d 323 (8th Cir. 1946), affg. a Memorandum Opinion of this Court; Casel v. Commissioner,79 T.C. 424, 435-437 (1982); Hyde v. Commissioner,supra;Joell Co. v. Commissioner,41 B.T.A. 825, 827 (1940). In the instant case, the partnership was not directly liable to the Bay State National Bank for the June 27, 1974, $500,000 *650 loan to Psoinos Construction. Consequently, the partnership may deduct its $30,812.47 reimbursement to Psoinos Construction for interest on that loan only if the partnership was legal or equitable owner of the subject property between June 27, 1974 and November 15, 1974. As we pointed out in Baird v. Commissioner,68 T.C. 115, 124 (1977), a taxpayer becomes the equitable owner of property when he assumes the "benefits and burdens" of ownership. Accord Deyoe v. Commissioner,66 T.C. 904, 910 (1976). When a taxpayer has assumed the "benefits and burdens" of ownership is a question of fact on which the taxpayer bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. It is a question to be resolved on an examination of all the facts and circumstances, but for purposes of real estate, a sale is generally considered to have occurred at the earlier of the transfer of legal title or the practical assumption of the benefits and burdens. Baird v. Commissioner,supra.
In the instant case, the partnership acquired legal title to the land on which the warehouse was built on November 15, 1974. Petitioners *651 contend, however, that as a practical matter the price for the warehouse was fixed as early as May, 1974. It requires no citation of authority to establish the proposition that the mere fixing of a purchase price does not shift the benefits and burdens of ownership from any seller to buyer in a typical real estate transaction, absent specific agreement to the contrary. Furthermore, even assuming the price for the warehouse was fixed at that time, petitioners have failed to prove that the identity of the ultimate purchaser was fixed at any time prior to November 15, 1974. In fact, so far as the record reveals, Essex, and not B & C Realty, was to be the owner of the warehouse prior to November 15, 1974. As respondent points out, 1) Essex was projected as the owner of the warehouse in the September, 1973, balance sheet and income statement drawn up by Sullivan for the banks, 2) Bay State National Bank initially assumed that Essex would be the owner of the property, 3) on July 19, 1974, Bay State National Bank approved a loan to Essex as borrower and Cregg and Bennett as guarantors only and 4) the $20,000 commitment fee was paid with Essex's funds. There are simply no written documents *652 in this record prior to November 15, 1974, which indicate that the partnership and not Essex was the proposed purchaser or equitable owner of the warehouse. Petitioners point to the testimony of both Cregg and Sullivan that, although never written down, it was always contemplated that the partnership would be the owner of the warehouse. We find such testimony to be of doubtful probative value in light of the above-noted written evidence to the contrary. Clearly, at some point it was decided that the partnership and not Essex would own the warehouse. Without some objective evidence identifying precisely the date this occurred, however, this Court has no choice but to agree with respondent that petitioners have not shown that the partnership became the purchaser or equitable owner of the warehouse before November 15, 1974. Since the partnership was not the equitable owner prior to November 15, 1974, the $30,812.47 of reimbursed interest payments are not deductible and must be capitalized. The remaining interest payments are similarly not deductible. This interest was computed based on the value of cash and land advanced by Psoinos Construction prior to November 15, 1974. Even *653 assuming, without deciding, that these advances were bona fide loans with legally enforceable terms, petitioners have failed to show they were loans to the partnership and not to Essex. To the extent these obligations were the obligations of another, the partnership may not take a deduction for interest payments made thereon. Hyde v. Commissioner,supra;Sheppard v. Commissioner,37 B.T.A. 279 (1938). Respondent disallowed a portion of the partnership's 1974 real estate tax deduction on the ground that the disallowed part represented taxes accrued for the period the partnership did not own the property -- i.e., the period prior to November 15, 1974. Section 164(a) provides a deduction for state and local real property taxes. Section 164 also provides: (c) DEDUCTION DENIED IN CASE OF CERTAIN TAXES.--No deduction shall be allowed for the following taxes: (2) Taxes on real property, to the extent that subsection (d) requires such taxes to be treated as imposed on another taxpayer. (d) APPORTIONMENT OF TAXES ON REAL PROPERTY BETWEEN SELLER AND PURCHASER.-- (1) GENERAL RULE.--For purposes of subsection (a), if real property is sold *654 during any real property tax year, then -- (A) so much of the real property tax as is properly allocable to that part of such year which ends on the day before the date of the sale shall be treated as a tax imposed on the seller, and (B) so much of such tax as is properly allocable to that part of such year which begins on the date of the sale shall be treated as a tax imposed on the purchaser. Although in their pretrial memorandum petitioners disputed this adjustment, we find no reference to it in their briefs. In any event, since we have held that petitioners have not shown that the partnership purchased the warehouse and land prior to November 15, 1974, we hold it may not deduct real estate taxes attributable to the period prior to that date. See Casel v. Commissioner,supra;Hyde v. Commissioner,supra.
Decision will be entered under Rule 155.
Footnotes
1. Paragraph 5 of the stipulation herein incorrectly states this number to be $227,302. The return itself shows an interest expense of $171,827 and a total partnership net loss of $227,302.↩
2. Resolution of this issue is necessary to properly compute petitioner's 1975 and 1976 taxes. See section 6214(b). Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩